1  MARC E. MAYER (SBN 190969); mem@msk.com
   EMILY F. EVITT (SBN 261491); efe@msk.com
2  MARK C. HUMPHREY (SBN 291718); mxh@msk.com
   MITCHELL SILBERBERG & KNUPP LLP
3  2049 Century Park East, 18th Floor
   Los Angeles, CA  90067-3120
4  Telephone: (310) 312-2000
   Facsimile: (310) 312-3100
5
   Attorneys for Plaintiffs
6

7

8                     UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11 | BUNGIE, INC., UBISOFT | CASE NO. 3:21-cv- 5677
   | ENTERTAINMENT, and UBISOFT, INC., |
12 | | **COMPLAINT FOR:**
   |              Plaintiffs, |
13 | | **(1) TRAFFICKING IN
   |        v.                          |     CIRCUMVENTION DEVICES;**
14 | |
   | ANDREW THORPE a/k/a KRYPTO, an | **(2) COPYRIGHT INFRINGEMENT;**
15 | individual; JONATHAN AGUEDA a/k/a |
   | OVERPOWERED, an individual; WESAM | **(3) TRADEMARK INFRINGEMENT;**
16 | MOHAMMED a/k/a GRIZZY, an individual; |
   | AHMAD MOHAMMED, an individual; and | **(4) FALSE DESIGNATION OF ORIGIN,
17 | Does 1 through 50, inclusive, |     15 U.S.C. § 1125(a);**
   | |
18 | |              Defendants. | **(5) INTENTIONAL INTERFERENCE
   | |     WITH CONTRACTUAL
19 | |     RELATIONS;**
   | |
20 | | **(6) UNFAIR COMPETITION**
   | |
21 | | **Demand For Jury Trial**

22

23

24

25

26

27

Mitchell
Silberberg &
Knupp LLP

13339949.1

28

CASE NO. 3:21-cv- 5677

**COMPLAINT**

1  Bungie, Inc. ("Bungie"), Ubisoft Entertainment, and Ubisoft, Inc. (together, "Ubisoft")

2  (collectively, "Plaintiffs") allege as follows:

3

4  **PRELIMINARY STATEMENT**

5  1.      Bungie and Ubisoft are the owners, or owners of certain exclusive rights, and

6  publishers of two of the most popular online multiplayer video games currently on the market:

7  "Destiny 2" and "Tom Clancy's Rainbow Six: Siege" ("R6S") (collectively, the "Games").

8  Plaintiffs bring this lawsuit in order to put an immediate stop to the unlawful, for-profit sale and

9  distribution of malicious software products designed to enable members of the public to gain

10  unfair competitive advantages (*i.e.*, to cheat) in the Games.  Such products impair and destroy

11  not only the game experience, but also Plaintiffs' overall businesses and their reputation among

12  their respective player communities.

13  2.      Defendants Andrew Thorpe, Jonathan Agueda, Wesam Mohammed, Ahmad

14  Mohammed, and an as-yet unknown number of individuals acting under various aliases

15  (together, "Defendants") operate, oversee, or participate in an online business venture called

16  "Ring-1."  Ring-1 is engaged in the development, sale, distribution, marketing, and exploitation

17  of a portfolio of malicious cheats and hacks for popular multiplayer games, including the Games.

18  Ring-1 largely operates via the website http://ring-1.io (the "Ring-1 Website").  Through the

19  Ring-1 Website, hundreds of message board "forums," and other related websites and social

20  media accounts, Defendants and those working in concert with them sell a suite of software

21  cheats, including cheats designed to be used with Destiny 2 (the "Destiny 2 Cheats") and R6S

22  (the "R6S Cheats") (collectively, the "Cheating Software").  The Cheating Software enables

23  players to manipulate the Games to their personal advantage, such as by automatically aiming

24  weapons, revealing locations of opponents, and allowing players to see information that

25  otherwise would be obscured.

26  3.      Defendants' conduct has caused, and is continuing to cause, massive and

27  irreparable harm to Plaintiffs and their business interests.  The success of Plaintiffs' games

28  depends on their being enjoyable and fair for all players.  Cheaters ruin the experience of playing

Mitchell
Silberberg &
Knupp LLP

13339949.1

the Games.  Not only do cheaters impair the enjoyment of gameplay by non-cheaters with whom they interact in-game, but cheaters also illegitimately obtain and thereby devalue the in-game rewards that non-cheaters obtain legitimately.  Defendants' sale and distribution of the Cheating Software therefore has caused Plaintiffs to suffer irreparable damage to their goodwill and reputation and to lose substantial revenue.  Moreover, Defendants not only know that their conduct is unlawful, but they engage in that conduct with the deliberate intent to harm Plaintiffs, their businesses, and their player communities.

4.     As a result of Defendants' conduct, Plaintiffs are entitled to monetary damages, injunctive and other equitable relief, and punitive damages.

## JURISDICTION AND VENUE

5.     This is a civil action seeking damages, injunctive relief, and other equitable relief under the anti-circumvention provisions of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201, the United States Copyright Act, the Lanham Trademark Act, and the laws of the State of California.

6.     This Court has subject matter jurisdiction over Plaintiffs' claims for violating the anti-circumvention provisions of the DMCA, copyright infringement, false designation of origin pursuant to 28 U.S.C. §§ 1331 and 1338(a), and violation of the Computer Fraud and Abuse Act (CFAA).  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' state law claims for intentional interference with contract and unfair competition, which are so related to Plaintiffs' federal claims as to be part of the same case or controversy.

7.     This Court has personal jurisdiction over Defendants because they have purposefully directed their activities at the United States, and at California in particular, have purposefully availed themselves of the benefits of doing business in California, and have established a continuing presence in California.  Plaintiffs are informed and believe, and on that basis allege, that, without limitation:

(a)     Defendants conduct extensive and ongoing business with users in the United States and the State of California;

Mitchell
Silberberg &
Knupp LLP

13339949.1

3

CASE NO. 3:21-cv- 5677

**COMPLAINT**

(b)     Defendants distribute the Cheating Software in the United States and the State of California, advertise and market the Cheating Software in the United States and the State of California, and communicate directly with users in the United States and the State of California, including for the purposes of soliciting purchases of the Cheating Software by such users and providing technical support for the Cheating Software;

(c)     Defendants have entered into, and continue to enter into, contracts with individuals in the United States and the State of California, including contracts pursuant to which these individuals license from Defendants the right to install and use the Cheating Software.  In return for such licenses, Defendants receive ongoing recurring daily, weekly, or monthly payments from individuals in the United States and the State of California; and

(d)     Defendants contract with entities located in the United States and the State of California in connection with their businesses.  This includes, for example, domain name registries and services such as Namesilo LLC and Cloudflare, hosting or content delivery services, and merchant banks and payment processors such as PayPal.

(e)     Defendants engage in conduct that they know is likely to cause harm to Plaintiffs in the United States and the State of California, including in this District.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this is a judicial district in which a substantial part of the events giving rise to the claims occurred, and/or in which Plaintiffs' injuries were suffered.

## **THE PARTIES**

9.     Bungie is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Bellevue, Washington.  Bungie is the publisher of, and owner of exclusive rights in and to, Destiny 2.

10.     Ubisoft Entertainment is a corporation duly organized and existing under the laws of France.  Ubisoft Entertainment is the owner of the United States copyright registration in R6S.

11.     Ubisoft, Inc. is a corporation duly organized and existing under the laws of California.  Ubisoft, Inc. is the United States publisher of R6S, and as such is the owner of

Mitchell
Silberberg &
Knupp LLP

13339949.1

4

CASE NO. 3:21-cv- 5677

**COMPLAINT**

1  certain exclusive U.S. rights in R6S, including the exclusive right to market and distribute R6S in

2  the United States.

3    12.   Together, Ubisoft, Inc. and Ubisoft Entertainment (collectively "Ubisoft") are the

4  owners of all of the exclusive rights under copyright in R6S in the United States.

5    13.   Defendants are informed and believe, and on that basis allege, that Defendant

6  Andrew Thorpe a/k/a "Krypto" is an individual residing in North Humberside, United Kingdom.

7  Defendants are informed and believe, and on that basis allege, that Thorpe is a Ring-1 staff

8  member and moderator of the Ring-1 Website.  In that role, Thorpe communicates with

9  Plaintiffs' customers in order to support and enable their use of the Cheating Software, and

10  serves as liaison to developers of the Cheating Software (and/or acts as a developer himself).

11  Among other activities, Thorpe assists customers in operating the Cheating Software, gives

12  advice to customers as to how to avoid being caught or detected by Bungie and/or Ubisoft for

13  using the Cheating Software, communicates to users about updates and improvements to the

14  Cheating Software, and otherwise facilitates the distribution and use of the Cheating Software.

15    14.   Plaintiffs are informed and believe, and on that basis allege, that Defendant

16  Jonathan Agueda a/k/a "Overpowered" is an individual residing in Windermere, Florida.

17  Plaintiffs are informed and believe, and on that basis allege, that Agueda is a Ring-1 staff

18  member, moderator of the Ring-1 Website, and a reseller of the Cheating Software.  In that role,

19  Agueda communicates with Plaintiffs' customers in order to support and enable their use of the

20  Cheating Software, serves as liaison to developers of the Cheating Software (and/or acts as a

21  developer himself), and directly distributes and sells the Cheating Software to Plaintiffs'

22  customers.  Among other activities, Agueda assists customers in operating the Cheating

23  Software, gives advice to customers as to how to avoid being caught or detected by Bungie

24  and/or Ubisoft for using the Cheating Software, communicates to users about updates and

25  improvements to the Cheating Software, and otherwise facilitates the distribution and use of the

26  Cheating Software.

27    15.   Plaintiffs are informed and believe, and on that basis allege, that Defendant

28  Wesam Mohammed a/k/a "Grizzy" ("Wesam") is an individual residing in Munster, Indiana.

Mitchell
Silberberg &
Knupp LLP

13339949.1

5

CASE NO. 3:21-cv- 5677

**COMPLAINT**

1  Plaintiffs are informed and believe, and on that basis allege, that Wesam is a longtime member of

2  Ring-1 and a prolific reseller of the Cheating Software.  In that role, Wesam directly sells the

3  Cheating Software to Plaintiffs' customers, and otherwise facilitates the distribution of the

4  Cheating Software.  Plaintiffs are further informed and believe, and on that basis allege, that

5  Wesam also does business as a reseller of the Cheating Software under the moniker "Gaming

6  Mods."

7        16.    Plaintiffs are informed and believe, and on that basis allege, that Defendant

8  Ahmad Mohammed ("Ahmad") is an individual residing in Munster, Indiana.  Plaintiffs are

9  informed and believe, and on that basis allege, that Ahmad is a reseller of the Cheating Software.

10  In that role, Ahmad directly sells the Cheating Software to Plaintiffs' customers, and otherwise

11  facilitates the distribution of the Cheating Software.

12        17.    Plaintiffs are informed and believe, and on that basis allege, that defendant Doe 1

13  a/k/a "Berserker" is a Ring-1 staff member who operates in a customer support role and is

14  responsible for much of the daily functioning of the Ring-1 Website.  In that role, Berserker

15  communicates with Plaintiffs' customers in order to support and enable their use of the Cheating

16  Software, serves as liaison to developers of the Cheating Software (and/or acts as a developer

17  themself), and directly distributes and sells the Cheating Software to Plaintiffs' customers.

18  Among other activities, Berserker assists customers in operating the Cheating Software, gives

19  advice to customers as to how to avoid being caught or detected by Bungie and/or Ubisoft for

20  using the Cheating Software, communicates to users about updates and improvements to the

21  Cheating Software, and otherwise facilitates the distribution and use of the Cheating Software.

22        18.    Plaintiffs are informed and believe, and on that basis allege, that defendant Doe 2

23  a/k/a "Cypher" is a Ring-1 staff member who operates in a customer support role and is

24  responsible for much of the daily functioning of the Ring-1 Website.  In that role, Cypher

25  communicates with Plaintiffs' customers in order to support and enable their use of the Cheating

26  Software, serves as liaison to developers of the Cheating Software (and/or acts as a developer

27  themself), and directly distributes and sells the Cheating Software to Plaintiffs' customers.

28  Among other activities, Cypher assists customers in operating the Cheating Software, gives

Mitchell
Silberberg &
Knupp LLP

13339949.1

6

CASE NO. 3:21-cv- 5677

**COMPLAINT**

advice to customers as to how to avoid being caught or detected by Bungie and/or Ubisoft for using the Cheating Software, communicates to users about updates and improvements to the Cheating Software, and otherwise facilitates the distribution and use of the Cheating Software.

19.     Plaintiffs are informed and believe, and on that basis allege, that defendant Doe 3 a/k/a "Admin," Doe 4 a/k/a "Calc," Doe 5 a/k/a "Overseer," Doe 6 a/k/a "Tralepo," Doe 7 a/k/a "Frost," Doe 8 a/k/a "Dove," and Doe 9 a/k/a "Pingu" are individuals involved in the Ring-1 operation in various respects, including but not limited to providing customer support for Ring-1 customers (*i.e.*, users of the Cheating Software) via online chat and messaging platforms, acting as moderators and/or administrators of the Ring-1 website, reselling the Cheating Software (both through the Ring-1 Website and other means), and developing and maintaining the Cheating Software.  The true names and capacities, whether individual, corporate, associate, or otherwise, of Admin, Calc, Overseer, Tralepo, Frost, Dove, and Pingu are unknown to Plaintiffs, which have therefore sued said defendants by such aliases and fictitious names.

20.     The true names and capacities, whether individual, corporate, associate, or otherwise, of the remaining Doe defendants are unknown to Plaintiffs, which have therefore sued said defendants by such aliases and fictitious names.  These defendants include individuals whose real identities are not yet known to Plaintiffs, but who are acting in concert with one another, often under the guise of Internet aliases, in committing the unlawful acts alleged herein. Among the Doe Defendants are developers, resellers, technical support staff, and other individuals who have participated in the development, sale, maintenance and distribution of the Cheating Software.  Plaintiffs will seek leave to amend this complaint to state their true names and capacities once said defendants' identities and capacities have been ascertained.  Plaintiffs are informed and believe, and on that basis allege, that all defendants sued herein are liable to Plaintiffs as a result of their participation in all or some of the acts set forth in this Complaint. (All of the aforementioned defendants, both the named defendants and the Doe defendants, are referred to herein collectively as "Defendants.")

21.     Plaintiffs are informed and believe, and on that basis allege, that at all times mentioned in this complaint, each of the Defendants was the agent of each of the other

Mitchell
Silberberg &
Knupp LLP

13339949.1

7

CASE NO. 3:21-cv- 5677

**COMPLAINT**

1   Defendants and, in doing the things alleged in this Complaint, was acting within the course and

2   scope of such agency.

3

4   **FACTS APPLICABLE TO ALL CLAIMS**

5   **Bungie and Destiny 2**

6        22.     Bungie is the developer, owner, and distributor of the video game Destiny 2.

7   Destiny 2 is an online multiplayer "first-person shooter" currently available on Windows-based

8   personal computers, as well as home video game consoles and the Google Stadia cloud gaming

9   service.  Destiny 2 originally was released on September 6, 2017, for the Sony Playstation 4 and

10  Microsoft Xbox One, and on October 24, 2017, for Windows computers.  Since the game's

11  initial release, Bungie has released for sale multiple expansions or add-ons to the main game

12  experience, including, most recently, the "Beyond Light" expansion released in November 2020.

13  These expansions offer players new quests, weapons, game modes, and other additions or

14  revisions to Destiny 2's core gameplay.

15       23.     Destiny 2 is an open, "shared-world" multiplayer, "first-person shooter" game in

16  which players can see and interact with one another.  The game offers two main types of

17  activities: player-versus-environment (PvE), in which players cooperate to fight against

18  computer-controlled opponents, and player-versus-player (PvP), in which players compete

19  against one another.  Players generally are free to complete activities in Destiny 2 on their own,

20  or with a team of friends (or people randomly assigned to them via matchmaking).  Some

21  activities, however, require players to team up with others, specifically three-player "Strikes"

22  and six-player "Raids," and some competitive PvP modes in which players can obtain extremely

23  rare items and other rewards.

24       24.     Matches played in Destiny 2's PvP modes are intense and highly competitive

25  affairs.  In Destiny 2, competition can be particularly intense due to the presence of rare loot

26  which can affect player progression, in addition to the prestige of obtaining highly visible in-

27  game "achievements" through competitive success in the endgame PvP modes.  As a result, the

28  demand for software that gives players an unfair advantage in Destiny 2's PvP modes is

Mitchell
Silberberg &
Knupp LLP

13339949.1

**COMPLAINT**

particularly high.  Some endgame PvP modes include skill-based matchmaking in which the most competitive players can test themselves against others similarly situated.  The high skill ceiling of endgame Destiny 2 PvP content is one of the selling points of Destiny 2, but also makes it much more frustrating when a player's experience is ruined by others using cheating software.

25.     Destiny 2's PvE modes can also become intense affairs because players can obtain highly visible in-game achievements as well as special physical merchandise linked to certain achievements by completing very challenging content within specific timeframes.  As such, many players take part in highly competitive "achievement hunting" in the hope of obtaining those awards.  The idea that players could qualify for these difficult-to-obtain awards by using cheat software, or that they are progressing more rapidly in order to become competitive by using cheats, cheapens the experience for legitimate players.

### Ubisoft and Tom Clancy's Rainbow Six: Siege

26.     Ubisoft is the developer, owner and publisher of the popular video game R6S. Ubisoft is the owner of certain exclusive rights of valid and subsisting copyrights in R6S and all of its expansions and add-ons.

27.     Initially released on December 1, 2015, R6S is a team-based, online multiplayer, military-themed "first-person shooter" game.  In R6S, players assume the role of an elite special forces operative.  Each player must work with other team members, and against a competing team, to complete objectives such as rescuing hostages, defusing bombs, or securing a biohazard container.  To accomplish these objectives, players must cooperate and communicate with their team members, each of whom brings a particular skill set to the overall team.  R6S players may play the game either "casually" or in competitive "ranked" matches where their success or failure affects their overall standing in the community.

28.     The success of R6S rests, in part, on Ubisoft's ability to offer a consistently compelling player experience so that its customers remain invested in R6S and play it for a sustained period of time.  R6S is a highly competitive, skill-based game with a fixed set of rules

Mitchell
Silberberg &
Knupp LLP

13339949.1

9

CASE NO. 3:21-cv- 5677

**COMPLAINT**

1   that have been carefully designed to ensure that all players stand on equal footing and have a fair

2   chance to defeat their opponents and progress in the game.  Maintaining proper game balance

3   therefore is absolutely critical to the game's success.  Ubisoft has spent thousands of hours to

4   ensure that the game is fair and fun to play.  If that balance is artificially upset, or if there is a

5   perception that some players are cheating or have an unfair advantage, then players will grow

6   frustrated with the game and stop playing.  That, in turn, could disrupt the entire R6S community

7   and cause the game to wither and die.

8

9   **Plaintiffs' Intellectual Property Rights in the Games**

10   Bungie and Destiny 2

11       29.       Bungie is the owner of all rights, title, and interest in the copyright in Destiny 2,

12   and all expansions, including without limitation, in its computer software and the audiovisual

13   works and screen displays that software creates (collectively, the "Destiny Copyrights").  These

14   copyrights are the subjects of U.S. Copyright Registrations TX 9-933-655, TX 8-933-658, PA 2-

15   282-670, and PA 2-280-030.

16       30.       Bungie also owns multiple trademarks associated with the Destiny franchise

17   including but not limited to DESTINY, DESTINY (& design), DESTINY 2, DESTINY 2:

18   LIGHTFALL, DESTINY 2: BEYOND LIGHT, and DESTINY 2: THE WITCH QUEEN

19   (collectively, the "DESTINY Marks.")

20       31.       Bungie began using the DESTINY and DESTINY (& design) marks in commerce

21   at least as early as February 1, 2013.  Since their first use, Bungie has continually used those

22   marks in connection with video game software.

23       32.       Bungie has invested substantial resources in marketing, advertising, and

24   distributing video games under the DESTINY Marks.

25       33.       Bungie has developed substantial goodwill and strong recognition in the

26   DESTINY Marks, and those marks have come to be associated with Bungie.  Through its

27   nationwide use and promotion of the DESTINY Marks, Bungie has established strong rights in

28   those trademarks and they are entitled to protection.

Mitchell
Silberberg &
Knupp LLP

13339949.1

CASE NO. 3:21-cv- 5677
**COMPLAINT**

34.     Bungie also owns the United States Patent and Trademark Office ("USPTO")

Registration No. 4,321,315 for the DESTINY (& design) mark:



Ubisoft and Tom Clancy's Rainbow Six: Siege

35.     Ubisoft is the owner of certain rights, title, and interest in the copyrights in Tom

Clancy's Rainbow Six: Siege and its expansions, including without limitation, in its computer

software and the audiovisual works and screen displays that software creates (collectively, the

"R6S Copyrights").  These copyrights are the subjects of U.S. Copyright Registrations TX 8-

981-568 and PA 1-981-990.

36.     Ubisoft also owns or has certain exclusive rights to multiple trademarks

associated with R6S including but not limited to the phrases RAINBOW SIX and the distinctive

Rainbow Six "6" design mark (the "6 Design Mark") depicted below (collectively, the "R6S

Marks"):



37.     Ubisoft began using certain of the R6S Marks in commerce in connection with

video games and computer software at least as early as 1998, and has used the "6 Design Mark"

since at least 2015.  Since their first use, Ubisoft has continually used those marks in connection

with video game software.

38.     Ubisoft has invested substantial resources in marketing, advertising, and

distributing video games under the R6S Marks.

Mitchell
Silberberg &
Knupp LLP

13339949.1

11

**COMPLAINT**

CASE NO. 3:21-cv- 5677

39.     Ubisoft has developed substantial goodwill and strong recognition in the R6S Marks, and those marks have come to be associated with Ubisoft. Through its nationwide use and promotion of the R6S Marks, Ubisoft has established strong rights in those trademarks and they are entitled to protection.

### **Plaintiffs' Business Models**

40.     The market for online first-person shooter games is extremely competitive, and at any given time players have many such games to choose from. Accordingly, Plaintiffs' success rests in large part on their ability to offer consistently compelling player experiences so that customers remain invested in the Games and play them for sustained periods of time. In order to stimulate player engagement long-term, both Destiny 2 and R6S utilize some form of a business model broadly known in the video game industry as "games as a service" or "live games." This generally involves supporting games long after their initial release with regular releases of monetized new content, with the goal of keeping players engaged so that they (and their friends) continue to play the games for years and remain invested.

41.     Much of the revenue Plaintiffs earn from the Games comes from dedicated or long-term players who enjoy the Games and wish to enhance their experiences by investing in, among other things, "virtual goods" (such as new characters, new weapons, and cosmetic upgrades such as distinctive "skins" or clothing) and expansion packs and passes that contain or grant access to new game content, thereby offering new facets to the game experience.

42.     Retaining and satisfying their respective player communities is an acute concern for both Bungie and Ubisoft, who go about doing so in similar, though ultimately unique, ways.

43.     Bungie offers Destiny 2 to the public for free. In order to play Destiny 2, a member of the public therefore need only register an account with Bungie, download the Destiny 2 game software, and connect to Bungie's multiplayer servers. Should a player wish to purchase optional in-game items, unlock new characters, or gain access to exclusive content, he or she may do so by purchasing in-game currency (known as "Silver"). Additionally, Bungie

Mitchell
Silberberg &
Knupp LLP

13339949.1

12                                    CASE NO. 3:21-cv- 5677
**COMPLAINT**

periodically creates and offers for sale Destiny 2 "expansions," which offer new content and new game modes.

44.     In order to play R6S, a player must purchase a copy of the game or a license from a digital retailer.  Once players have purchased the game, however, they are able to obtain items in-game through multiple methods.  For example, players can simply buy characters, uniforms, weapons skins and other items using R6S's in-game currency, known as "R6 Credits," which are purchased with real-world money.  Players also can acquire in-game items using the game's "Battle Pass" microtransaction system, which allows players to gain new cosmetics, Operators, and other items by playing multiplayer matches, obtaining "battle points," and unlocking rewards upon reaching various benchmarks (referred to in the game as "tiers").

45.     Battle Passes are offered on two tracks – free and premium.  The free track allows a player to play the game and periodically obtain new rewards at no additional cost.  The premium track allows players to do the same thing and unlock not only the free track rewards, but also a different set of rewards as well.  Players also can purchase a "Premium Bundle" that immediately unlocks access to 12 tiers and provides players with additional items.

46.     The revenue from the sale of game content, virtual currency, digital enhancements or expansions, and Battle Passes is what enables each of Bungie and Ubisoft to maintain, update, service, and develop the Games and their online services.  Accordingly, it is paramount to Plaintiffs' business models that the Games retain the interest of their respective user bases for a sustained period of time, so that players will remain dedicated to the Games, recommend the Games to friends and family, and continue to purchase virtual items, expansions, and Battle Passes.

47.     A vital part of the player experience is the fairness and integrity of the Games, and thus Bungie and Ubisoft invest an enormous amount of time and money to ensure that all players stand on equal footing and have a fair chance of progressing in the Games.  If players perceive that others are cheating or have an unfair advantage, they may grow frustrated with the Games and stop playing them.  That, in turn, could disrupt and/or destroy Destiny 2's and R6S's

Mitchell
Silberberg &
Knupp LLP
13339949.1

13                    CASE NO. 3:21-cv- 5677
COMPLAINT

1   player communities and severely harm Plaintiffs' ability to generate revenue and to maintain,

2   improve, and expand the Games.

4   **Plaintiffs' Efforts To Protect Against Hackers And Cheaters**

5   48.   Because the Games are so popular, unscrupulous actors such as Defendants seek

6   to exploit them for their own personal gain and profit by selling cheats, hacks, and other

7   malicious software, knowing that they are ruining the experience for other players and harming

8   Plaintiffs.

9   49.   To understand Defendants' conduct, it is important to understand what

10   multiplayer games are and how they operate.  In broad terms, multiplayer games are comprised

11   of two interrelated components.

12   (a)   First, all players must install on their personal computers a game "software

13   client," which is a set of software files.  These files include artwork, 3D models, "textures" (*i.e.*,

14   artwork applied to surfaces), "skins" (*i.e.*, artwork applied to character models), and an

15   underlying game "engine" that creates the virtual environment and enables player interaction

16   with that environment and with computer-controlled and human-controlled characters or

17   monsters.

18   (b)   Second, the software client must connect to a remote server that is owned

19   and operated by the game publisher or by third parties on the publisher's behalf.  The server runs

20   software that connects players to each other, generates the dynamic virtual world, and transmits

21   information from one player to another.  The server rapidly receives and transmits a large body

22   of data back-and-forth between and among players, and that data is used by the software client to

23   effectuate changes on the player's computer screen.  The game server is an integral part of an

24   online game, and the game cannot be played without both client and server.  As such, the

25   copyright in a multiplayer computer game extends not just to the specific art files or assets

26   contained in the client files, but also to the dynamic virtual world created by the interaction

27   between client and server.

28

Mitchell
Silberberg &
Knupp LLP

13339949.1

14

CASE NO. 3:21-cv- 5677

**COMPLAINT**

50.     Cheating software like that sold by Defendants alters the normal functioning of an online game by injecting parasitic code into the memory of the cheater's computer.  This code intercepts and alters the communications between software client and server in a manner that causes the game to operate differently for the cheating player.  Thus, for example, the software client will render images of the playing field in ways that are abnormal, or will take commands from the player and change them as they are being sent to the server.

51.     As video games have become increasingly complex, so has cheating software.  As a result, Plaintiffs undertake to protect the integrity of Destiny 2 and R6S through a variety of means, including both technical and contractual.

Technical Protection

52.     In order to protect the Games from cheating or unauthorized exploitation, Plaintiffs employ anti-cheat technologies.  These technologies are installed on the user's computer when the software client is installed, and they must be installed in order for users to be able to play the Games.  These anti-cheat technologies are designed to protect and prevent players from accessing, reading, writing or modifying critical data used by the computer to enable multiplayer online gameplay.

53.     In the normal course of operation, Plaintiffs' anti-cheat software will detect whether malicious code has been inserted or injected into a computer's memory or otherwise determine whether a player is using cheating software such as the Cheating Software.  If the anti-cheat software detects the presence of cheating software, the player will be denied access to Destiny 2's or R6S's respective multiplayer servers or, in some circumstances, reported to the game publisher for disciplinary action, which may include being "banned" from the game (*i.e.*, having the player's account permanently deleted).

54.     Plaintiffs' anti-cheat technologies are effective at detecting when players are running cheating software.  Thus, in order for any hack or cheat software to operate, it

Mitchell
Silberberg &
Knupp LLP

13339949.1

15                     CASE NO. 3:21-cv- 5677
**COMPLAINT**

specifically must be designed to prevent or avoid detection by Plaintiffs' anti-cheat software, such as by concealing or encrypting itself or by disabling the anti-cheat technology.

55.     Additionally, when Plaintiffs identify or detect that a player is using cheating software, the player's account may be suspended or "banned," such that the player may no longer access the game and its remote server.  Depending upon the player's conduct, Plaintiffs may also implement a "Hardware ID" ("HWID") ban against players engaged in hacking or cheating.  To implement a HWID ban, Plaintiffs obtain configuration data from the offending player's PC, assign a unique code to the PC, and deny subsequent access to the game by players using that PC.  This ensures that players who have lost access to the game cannot re-obtain such access merely by creating a new account or using a different email address.

56.     Individuals or entities like Defendants spend a great deal of time and effort devising methods to avoid detection of their cheating software by Plaintiffs.  Plaintiffs, in turn, must continually spend time, effort, and money improving and enhancing their anti-cheat technology.  The result is an arms race, in which Bungie and Ubisoft must constantly stay one step ahead of cheat developers and sellers.

<u>Contractual Protection</u>

57.     In order to access, download, or play the Games, users also must create and register accounts with Bungie or Ubisoft and agree to written license agreements and terms of use.

58.     Upon downloading the Destiny 2 client and beginning installation, users must expressly manifest their assent to Bungie's Limited Software License Agreement ("SLA").  Similarly, upon downloading R6S and beginning installation, players are required to expressly manifest their assent to the "Ubisoft Terms of Use" and End-User License Agreement (collectively, the "TOU"), and also to the "Rainbow Six: Siege Code of Conduct" (the "Code of Conduct").[1]  The entire text of the SLA or the TOU and Code of Conduct is displayed to users at

---

[1] Bungie's SLA is available at bungie.net/7/en/Legal/SLA.  Ubisoft's TOU is available at https://legal.ubi.com/termsofuse/en-US; the Code of Conduct is incorporated by reference in the

Mitchell
Silberberg &
Knupp LLP

13339949.1

the time they first access their Bungie or Ubisoft accounts while installing Destiny 2 or R6S.  If a user refuses to consent to any of these agreements, installation halts and the programs immediately close.[2]

59.     Bungie's SLA includes a limited license agreement between Bungie and its users. Under the SLA, users are required to agree not to, among other things, "hack or modify [Destiny 2], or create, develop, modify, distribute, or use any unauthorized software programs to gain advantage in any online or multiplayer game modes."  Users also are required to agree not to "receive or provide 'boosting services,' to advance progress or achieve results that are not solely based on the account holder's gameplay."

60.     Destiny 2 is made available to the public exclusively through Bungie's proprietary servers and matchmaking systems.  Access to these servers also requires assent to the SLA.  Thus, it is not possible for a user to lawfully obtain access to or play Destiny 2 without expressly consenting to the SLA.

61.     Ubisoft's TOU also includes a conditional, limited license agreement between Ubisoft and its users.  Under the TOU, Ubisoft licenses the right to download, copy, install, and play R6S (as well as other Ubisoft games), subject to certain terms, restrictions, and conditions. Among other provisions, the Ubisoft End User License Agreement expressly states that, as a condition to the limited license: "You undertake not to directly or indirectly…

- modify, distort, block, abnormally burden, disrupt, slow down and/or hinder the normal functioning of all or part of the Services, or their accessibility to other Users, or the functioning of the partner networks of the Services, or attempt to do any of the above…

- create, use and/or circulate "auto" or "macro" computer programs or other cheat programs or software applications, and/or use the Services via a mirror site;

---

TOU and made available at https://rainbow6.ubisoft.com/siege/en-us/news/152-326395-16/rainbow-six-siege-code-of-conduct.

[2] The SLA, TOU and Code of Conduct are at times referred to collectively herein as the "License Agreements."

Mitchell
Silberberg &
Knupp LLP
13339949.1

- "bot", "hack", "mod", "trainer", or "crack", or otherwise attempt to circumvent any access control, copyright protection or license-enforcement mechanisms associated with or related to the Services…"

62.    The R6S Code of Conduct also expressly forbids "[a]ny conduct which interrupts the general flow of Gameplay in the Game client, forum, or any other Ubisoft medium," "[a]ny attempt to edit, corrupt or change Game or server code," and "use of third-party hacking, cheating or botting clients."

63.    R6S is made available to the public exclusively through dedicated servers maintained by Ubisoft or its partners.  Access to these servers also requires assent to the TOU and Code of Conduct.  It is not possible for a user to lawfully obtain access to or play R6S without expressly consenting to the TOU and Code of Conduct.

## Defendants' Development, Marketing and Sale of the Cheating Software

64.    Plaintiffs are informed and believe, and on that basis allege, that Defendants collectively are engaged in developing, updating, marketing, distributing, selling, deploying, and supporting the Cheating Software.  Some of the Defendants are software developers; others own, operate, and/or moderate the Ring-1 Website and its community forum; others provide customer support or technical assistance; and others are "resellers" who acquire and resell keys for Ring-1 software to members of the public.  Some of the Defendants perform several of these functions. Plaintiffs will amend this Complaint at such time as they determine the identities of the Doe Defendants and which of Defendants performed which functions.

65.    As a result of Defendants' conduct, the Cheating Software is offered for sale to the public on the Ring-1 Website.  Access to the Destiny 2 Cheats is offered for sale on the Ring-1 Website for 30€a week and 60€a month, with access to the R6S Cheats offered for 25€a week and 50€a month.

66.    Additionally, licenses for the Cheating Software may be made available for purchase from authorized "resellers," including certain of Defendants.  These resellers generally

Mitchell
Silberberg &
Knupp LLP

13339949.1

18                    CASE NO. 3:21-cv- 5677
COMPLAINT

1  are individuals who have been given access to digital product "keys" to sell to others in exchange

2  for a portion of the purchase price.

3      67.    Plaintiffs are informed and believe, and on that basis allege, that the Cheating

4  Software has been downloaded and used by Destiny 2 and R6S players thousands of times,

5  including by players residing in the United States and in California.  Plaintiffs also are informed

6  and believe that Defendants have made tens or hundreds of thousands of dollars from their

7  distribution and sale of the Cheating Software.

8      68.    Plaintiffs are informed and believe, and on that basis allege, that in addition to

9  marketing and distributing cheats (including but not limited to the Cheating Software),

10  Defendants provide extensive and ongoing customer support and technical assistance for the

11  Cheating Software.  The Ring-1 Website specifically advertises its "Dedicated Support," which

12  Plaintiffs are informed and believe, and on that basis allege, is provided via the extensive forums

13  on the Ring-1 Website, as well as other communication platforms.

14      69.    In developing, updating, marketing, distributing, selling, deploying, and

15  supporting the Cheating Software, Defendants engaged in a number of unlawful acts, as

16  enumerated below.

17

18      Defendants Engaged In Unauthorized Reproduction and Adaptation of Plaintiffs' Games To

19                        Create The Cheating Software

20      70.    Plaintiffs are informed and believe, and on that basis allege, that in order to

21  create, improve, test, and maintain the Cheating Software, one or more of the Defendants or

22  freelance hackers, acting at Defendants' direction or in concert with them, fraudulently obtained

23  access to Plaintiffs' software clients for each of the Games.  They did so by purporting to assent

24  to the License Agreements, knowing that they did not intend to comply with the terms, but

25  instead intending to engage in unauthorized copying, reverse engineering, disassembling,

26  decompiling, and/or creating derivative works of the Games.

27      71.    Plaintiffs are informed and believe, and on that basis allege, that once in

28  possession of Plaintiffs' copyrighted software code, certain of Defendants or freelance hackers

Mitchell
Silberberg &
Knupp LLP

13339949.1

                        19                    CASE NO. 3:21-cv- 5677
                        COMPLAINT

1   working in concert with them engaged in multiple acts of unauthorized reproduction, adaptation,

2   and/or distribution of Plaintiffs' copyrighted works in order to reverse engineer, disassemble,

3   decompile, and decrypt those works in order to develop and test the Cheating Software.  Such

4   testing included using the Cheating Software in connection with Plaintiffs' proprietary servers,

5   which they gained access to under false pretenses, such as by using "throwaway" accounts and

6   fake names.

7

8   Defendants Use Plaintiffs Artwork And Trademarks To Market And Sell The Cheating Software

9   Via The Ring-1 Website

10      72.     The Ring-1 Website is a slick, professionally created website that features an

11   array of images and artwork from a number of video games, including Plaintiffs' Games.  The

12   Ring-1 Website also prominently displays the well-known logos of various games, including

13   Plaintiffs' Games, as illustrated below:

14



25      73.     The homepage of the Ring-1 Website also prominently advertises cheats for

26   certain games, including Destiny 2.  The homepage advertisement for Destiny 2 touts a long list

27   of "features," next to a large "PURCHASE NOW" button that directs the user to the page where

28   the cheat can be purchased using various methods such as PayPal or BitCoin:

Mitchell Silberberg & Knupp LLP

13339949.1

20                    CASE NO. 3:21-cv- 5677

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Mitchell
Silberberg &
Knupp LLP

13339949.1

21                   CASE NO. 3:21-cv- 5677
**COMPLAINT**

1

2

3        74.     On the Ring-1 Website, Defendants offer a separate purchase page for each

4   Cheating Software product.  The purchase page for the Destiny 2 Cheats and R6S Cheats

5   includes key art from Plaintiffs' games, along with links to share the customer's purchase of the

6   cheat with others on social media websites such as Facebook, Twitter, and LinkedIn.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Mitchell
Silberberg &
Knupp LLP

13339949.1

22                    CASE NO. 3:21-cv- 5677
**COMPLAINT**

1

2            <u>The Cheating Software Modifies And Alters Plaintiffs' Games</u>

3       75.    Once a player purchases a license for the Cheating Software, he or she may

4   download the Cheating Software "loader" from a remote server maintained by Defendants.

5   Plaintiffs are informed and believe, and on that basis allege, that the Cheating Software loader is

6   not a stand-alone piece of software.  Rather, to use the Cheating Software, the player must be

7   connected to the Internet and possess a valid license key.  Defendants' remote server checks the

8   customer's license to verify that his or her subscription is active.

9       76.    Once the player has passed the verification check and starts the Cheating

10  Software, the player may click a button to "inject" the malicious Cheating Software code into his

11  or her computer.  This code interacts with the Game client and with areas of the player's

12  computer that are used to play the Game.  The Cheating Software also generates a user interface

13  that allows the player to select which features of the Game he or she wishes to change, as

14  illustrated below:

15

16  

17

18

19

20

21

22

23

24

25

26

27

28      77.    Features offered by the Cheating Software include, without limitation:

Mitchell
Silberberg &
Knupp LLP

13339949.1

a.  Aimbots, which cause the player's aim to "snap" to an opponent when they appear onscreen, allowing for quick, precision shots.

b.  HWID Spoofers, which allow players to hide information about the systems they are running in order to avoid detection by anti-cheat software or use hardware that has been "banned" by Plaintiffs (*i.e.*, it can no longer be used to access the Game).

c.  "ESP," which allows players to see information that they normally would not be able to during a Destiny 2 or R6S game (such as the locations of other players within the game world).

d.  Technologies that make the cheats "Streamproof" (*i.e.*, undetectable by recording or streaming software).

e.  Specific to R6S, a "Long Knife" cheat which allows a player to use the knife weapon against another player from across the game map, resulting in an instant kill.

f.  Miscellaneous cheats such as unlimited ammo and instant respawning upon death.

78.     When a player is running the Cheating Software in connection with Plaintiffs' Games, the Cheating Software substantially alters the Game's visual output and the way the Game performs for the cheating player.  These alterations persist until the player exits the Game or reboots his or her computer.

79.     As a result of the modifications made by the Cheating Software, the Games look significantly different from their original, intended appearance.  For example, when a player is using the Cheating Software, additional text, numbers, or images may be displayed on the player's screen; other player avatars may appear in unusual colors; "hit boxes" may appear around opposing players to illustrate where the weapon must be fired to hit; and opposing players may appear as silhouettes behind walls or obstacles.

80.     The Cheating Software also will cause the Game to perform or play differently for the cheating player than it performs for all other players.  For example, a player using an

Mitchell
Silberberg &
Knupp LLP

13339949.1

24                          CASE NO. 3:21-cv- 5677
**COMPLAINT**

1    "aimbot" will not need to aim his or her weapon to hit another player, as the computer will

2    correct or assist the player's aim.  Similarly, when the Cheating Software is being used, the

3    player may not need to reload his or her weapon, or may immediately recover (or "respawn")

4    from what otherwise would have been a fatal hit.

5

6        The Cheating Software Circumvents Plaintiffs' Access Control and Anti-Cheat Technologies

7        81.     Remaining "undetected" by Plaintiffs and their anti-cheat software is a critical

8    selling point for the Cheating Software.  Thus, the Ring-1 Website claims that users are "100%

9    guaranteed to always play with an undetected cheat for the full extend [*sic*] of [their]

10   subscription."

11       82.     The Ring-1 Website also states that Ring-1 uses "Intel Virtualization to bring you

12   the best security possible, giving us an upper hand against the Anti-Cheat."  Additionally, the

13   Ring-1 Website boasts that the Cheating Software includes numerous features that will help

14   avoid detection, including the aforementioned HWID Spoofers and Streamproof software.

15   HWID Spoofers purport to enable players to bypass HWID bans.  Streamproof software purports

16   to disguise cheating activity in online broadcasts of matches, thereby making such activity more

17   difficult to detect.

18       83.     In fact, remaining undetected is so important to the success of the Cheating

19   Software that Defendants maintain a live "status" page that advises users as to whether any

20   particular cheat is "safe to use" or has been "detected" by the game publisher:

21

**COMPLAINT**

Mitchell
Silberberg &
Knupp LLP

13339949.1

84.     Once a cheat has been detected by Plaintiffs' anti-cheat technology (and therefore is deemed "unsafe" to use), Defendants promptly begin "updating" and "testing" the product until it once again has been deemed to be "safe."  A significant portion of the value of the Cheating Software comes from Defendants' dedication to ensuring that the Cheating Software remains "100% undetected" by Plaintiffs.

85.     Plaintiffs are informed and believe, and on that basis allege, that in order for the Cheating Software to operate with the Games, the Cheating Software necessarily includes technology that primarily is designed to avoid, bypass, evade, or otherwise circumvent Plaintiffs' anti-cheat technologies – as is obvious from Defendants' marketing.  Accordingly, each time Defendants sell a license to the Cheating Software they are trafficking in technology that controls access to the Games.

Use of the Cheating Software Violates The License Agreements

86.     Each time a player uses the Destiny 2 Cheats, he or she also violates Bungie's SLA, including those provisions that specifically prohibit players from "hack[ing] or modify[ing] [Destiny 2], or creat[ing], develop[ing], modify[ing], distribut[ing], or [using] any unauthorized software programs to gain advantage in any online or multiplayer game modes."  And, each time a player uses the R6S Cheats, he or she violates Ubisoft's TOU and Code of Conduct, including those provisions set forth above.  Accordingly, Plaintiffs are informed and believe, and on that basis allege, that as a result of Defendants' conduct, thousands or tens of thousands of breaches of these contracts have occurred.

87.     Plaintiffs are informed and believe, and on that basis allege, that Defendants are fully aware that the use of the Cheating Software violates the License Agreements.  For example, the Ring-1 Website repeatedly assures users that because the Cheating Software is undetected, users will not be at risk of being banned from the Games.

88.     The Cheating Software has no purpose or function other than to enable players to violate the License Agreements by using cheats and exploits.  Thus, Defendants' goal is to

Mitchell
Silberberg &
Knupp LLP

13339949.1

26                      CASE NO. 3:21-cv- 5677
COMPLAINT

1   ensure that their customers continue to receive the benefits of their contracts with Plaintiffs while

2   they simultaneously engage in continuing breaches of their obligations under those contracts.

4   <u>The Cheating Software Causes Serious And Irreparable Harm To Plaintiffs</u>

5         89.    By their conduct, Defendants have caused and continue to cause serious harm to

the Games and to Plaintiffs.  Such harm is immediate, massive and irreparable, and includes (but

is not limited to) the following:

         (a)    Defendants irreparably harm the ability of Plaintiffs' legitimate customers

to enjoy and participate in the online experiences carefully created by Plaintiffs.  That, in turn,

causes users to grow dissatisfied with the Games, lose interest, stop playing, and stop investing

in the Games.

         (b)    Defendants' conduct has forced Plaintiffs to spend enormous sums of

money (and vast amounts of time) attempting to remediate the damage caused by the Cheating

Software.  This includes creating and releasing new versions of the Games that counteract the

Cheating Software, responding to player complaints, employing personnel to police the Games to

detect the use of the Cheating Software, and banning users who are using the Cheating Software.

         (c)    Defendants' conduct harms Plaintiffs' reputation and results in the loss of

significant customer goodwill.

         90.    Defendants' conduct has resulted in damage to Plaintiffs in an amount to be

proven at trial.  By Plaintiffs' estimation, such damage may amount to millions of dollars.

Unless and until Defendants are preliminarily or permanently enjoined, Plaintiffs will continue to

suffer severe harm from the Cheating Software.

## COUNT I

### Trafficking In Circumvention Devices

         91.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1

through 90, as if set forth fully herein.

Mitchell
Silberberg &
Knupp LLP

13339949.1

27

CASE NO. 3:21-cv- 5677

**COMPLAINT**

92.     The Games, including but not limited to their source code, screen displays, and audiovisual game play environments, are copyrighted works.

93.     Plaintiffs have incorporated into the Games technological measures that effectively control access to each Game, including access to the dynamic audiovisual elements that comprise the Game and to otherwise inaccessible memory locations in which data generated by the Games is stored and maintained.

94.     The Cheating Software is comprised of or contains technologies, products, services, devices, components, or parts thereof that primarily are designed or produced for the purpose of circumventing technological measures that effectively control access to the Games.

95.     The Cheating Software (and the portions thereof that circumvent Plaintiffs' anti-cheat technologies) have no commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a copyrighted work and that protects the exclusive rights of a copyright owner.

96.     Defendants market the Cheating Software in the United States with knowledge of their use to circumvent Plaintiffs' technological access controls.

97.     As a result of the foregoing, Defendants are offering to the public, providing, importing, or otherwise trafficking in technology that violates 17 U.S.C. § 1201(a)(2).

98.     Defendants' acts constituting DMCA violations have been and continue to be performed without the permission, authorization, or consent of Plaintiffs.

99.     Defendants have violated Section 1201 of the DMCA willfully and for private commercial gain.

100.     Defendants' conduct has caused damage to Plaintiffs and has unjustly enriched Defendants, in an amount to be proven at trial.

101.     As a result of Defendants' acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Plaintiffs are informed and believe, and on that basis allege, that, unless enjoined and restrained by this Court, Defendants will continue to violate Section 1201 of the DMCA.

Mitchell
Silberberg &
Knupp LLP

13339949.1

28
CASE NO. 3:21-cv- 5677
**COMPLAINT**

Plaintiffs are entitled to injunctive relief to restrain and enjoin Defendants' continuing unlawful conduct.

102.    As a direct and proximate result of Defendants' conduct, pursuant to 17 U.S.C. § 1203(c), Plaintiffs are entitled to Defendants' profits attributable to their violations of 17 U.S.C. § 1201.

103.    Alternatively, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 1203(c)(A), in the amount of $2,500 with respect to each violation by Defendants.

104.    Plaintiffs further are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 1203(b).


## COUNT II

## Copyright Infringement

105.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 104, as if set forth fully herein.

106.    The Games, including their underlying source code, client files, screen displays, artwork, and other audiovisual elements, constitute original works of authorship and copyrightable subject matter under the laws of the United States.  Plaintiffs own the copyrights or have exclusive rights under copyright in and to the Games.

107.    Defendants engaged in acts of unlawful reproduction, adaptation, public display, and public performance of the Games and their constituent elements, including but not limited to by (a) reproducing artwork and images from the Games on the Ring-1 Website; (b) adapting the Games or causing the Games to be adapted by modifying the Games' performance, appearance, and screen displays; and (c) reproducing Game client files without a license or outside the scope of the license in the process of reverse engineering, testing, and/or decompiling those files in connection with the development of the Cheating Software.  Such conduct constitutes copyright infringement.

108.    In the alternative, to the extent that Defendants' users are engaged in acts of copyright infringement by using the Cheating Software to create unauthorized derivative works

CASE NO. 3:21-cv- 5677

Mitchell
Silberberg &
Knupp LLP

13339949.1

1   by modifying the Games' performance, appearance, and screen displays, Defendants are liable

2   for inducing and contributing to such acts of infringement.

3        109.    Defendants' acts of infringement were willful, in disregard of, and with

4   indifference to, the rights of Plaintiffs.

5        110.    As a direct and proximate result, Plaintiffs are entitled to damages and to

6   Defendants' profits in amounts to be proven at trial, which are not currently ascertainable.

7   Alternatively, Plaintiffs are entitled to maximum statutory damages of $150,000 for each

8   copyrighted work infringed, or in such other amount as may be proper under 17 U.S.C. § 504(c).

9        111.    Plaintiffs further are entitled to their attorneys' fees and full costs pursuant to

10   17 U.S.C. § 505.

11        112.    As a result of Defendants' acts and conduct, Plaintiffs have sustained and will

12   continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate

13   remedy at law.  Plaintiffs are informed and believe, and on that basis allege, that unless enjoined

14   and restrained by this Court, Defendants will continue to contribute to infringement of Plaintiffs'

15   copyrights.  Plaintiffs are entitled to injunctive relief to restrain and enjoin Defendants'

16   continuing unlawful conduct.

17

18   **COUNT III**

19   **Trademark Infringement, 15 U.S.C. § 1114**

20        113.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1

21   through 112, as if set forth fully herein.

22        114.    By using the registered DESTINY Marks and the R6S Marks on the Ring-1

23   Website and otherwise in connection with Defendants' Cheating Software, Defendants' actions

24   are likely to cause confusion, mistake, or deception as to the source, origin, sponsorship, or

25   authenticity of Defendants' Cheating Software.

26        115.    Plaintiffs are entitled to the relief provided by 15 U.S.C. § 1117(a), including, but

27   not limited to, Defendants' profits, Plaintiffs' damages, and the costs of this action.

28

Mitchell
Silberberg &
Knupp LLP

13339949.1

CASE NO. 3:21-cv- 5677

**COMPLAINT**

116.   Defendants knew of Plaintiffs' rights, and their infringement has been knowing, willful, and deliberate, such that the Court should award Plaintiffs their attorneys' fees pursuant to 15 U.S.C. § 1117.

117.   Defendants' activities have damaged, and threaten to continue damaging, Plaintiffs' reputation and goodwill.

118.   Plaintiffs have been, and continue to be, damaged by such acts in a manner that cannot be fully measured or compensated in economic terms and therefore have no adequate remedy at law.  Furthermore, upon showing a violation of 15 U.S.C. § 1114, Plaintiffs are entitled to a rebuttable presumption of irreparable harm from that violation, and seek permanent injunctive relief pursuant to 15 U.S.C. § 1116.

## COUNT IV

## False Designation of Origin, 15 U.S.C. § 1125(a)

119.   Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 118, as if set forth fully herein.

120.   By virtue of Plaintiffs' continuous and extensive use in commerce of the DESTINY Marks and the R6S Marks, the DESTINY Marks and the R6S Marks have acquired secondary meaning in the marketplace in connection with Plaintiffs' goods and services.

121.   By using the DESTINY Marks and the R6S Marks on the Ring-1 Website and otherwise in connection with Defendants' Cheating Software, Defendants' actions constitute the use in interstate commerce of a false designation of origin, false or misleading description of fact, or false or misleading representations of fact that are likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association of Defendants' products and services with Plaintiffs, or as to the origin, sponsorship, or approval of the goods and services provided by Defendants in violation of 15 U.S.C. § 1125(a).

122.   Plaintiffs are entitled to the relief provided by 15 U.S.C. § 1117(a), including, but not limited to, Defendants' profits, Plaintiffs' damages, and the costs of this action.

123.    Defendants knew of Plaintiffs' rights, and their infringement has been knowing, willful, and deliberate, such that the Court should award Plaintiffs their attorneys' fees pursuant to 15 U.S.C. § 1117.

124.    Defendants' activities have damaged, and threaten to continue damaging, Plaintiffs' reputation and goodwill.

125.    Plaintiffs have been, and continue to be, damaged by such acts in a manner that cannot be fully measured or compensated in economic terms and therefore have no adequate remedy at law.  Furthermore, upon showing a violation of 15 U.S.C. § 1125(a), Plaintiffs are entitled to a rebuttable presumption of irreparable harm from that violation, and seek permanent injunctive relief pursuant to 15 U.S.C. § 1116.

## COUNT V

### Intentional Interference With Contractual Relations

126.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 125, as if set forth fully herein.

127.    As described herein, in order to install and play the Games, licensed users in the United States first must assent to the License Agreements.

128.    Plaintiffs' contracts with their users are valid and enforceable.

129.    Each time a purchaser of the Cheating Software uses the Cheating Software in connection with the Games, he or she breaches the License Agreements.  Plaintiffs are informed and believe, and on that basis allege, that thousands of such breaches have taken place by Defendants' customers.

130.    Plaintiffs are informed and believe, and on that basis allege, that Defendants are aware of both the existence and specific relevant terms of contracts between Plaintiffs and their users in the United States, including the License Agreements.  Specifically, Defendants are aware that the License Agreements prohibit players from using the Cheating Software and that players are at risk of being banned from the Games should they be caught using the Cheating Software.  Nevertheless, Defendants intentionally encourage and induce users of the Games to

Mitchell
Silberberg &
Knupp LLP

13339949.1

32

CASE NO. 3:21-cv- 5677

**COMPLAINT**

1  purchase and use the Cheating Software, knowing that the use of these products by their

2  customers is a breach of these customers' contracts with Plaintiffs.

3      131.    By inducing Plaintiffs' users to breach their contracts with Plaintiffs, Defendants

4  have intentionally interfered, and continue to interfere, with the contracts between Plaintiffs and

5  their users.

6      132.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered

7  damage in an amount to be proven at trial, including but not limited to a loss of goodwill among

8  users of Plaintiffs' games, diversion of Plaintiffs' resources to attempt to detect and prevent the

9  use of the Cheating Software, decreased profits, and a loss of profits from users whose accounts

10  Plaintiffs have terminated for violation of the License Agreements in the United States.

11      133.    As a further result of Defendants' actions, Defendants have unjustly obtained

12  specifically identifiable property, consisting of all of the proceeds attributable to the sale of the

13  Cheating Software in the United States, and any other products or services that violate any of

14  Plaintiffs' rights, and any additional property traceable to those proceeds.  Those proceeds,

15  which are directly attributable to Defendants' manipulation and misuse of the Games and

16  intentional interference with Plaintiffs' contracts, rightfully and equitably belong to Plaintiffs.

17      134.    Defendants' intentional interference with the contracts between Plaintiffs and

18  their licensed users in the United States entitles Plaintiffs to injunctive relief and compensatory

19  damages, the imposition of a constructive trust over Defendants' wrongfully obtained proceeds,

20  and other available relief.

21      135.    Defendants are guilty of oppression, fraud, or malice, and Plaintiffs, in addition to

22  their actual damages, by reason thereof, are entitled to recover exemplary and punitive damages

23  against Defendants.

24

25                                **COUNT VI**

26                          **Unfair Competition**

27      136.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1

28  through 135, as if set forth fully herein.

Mitchell
Silberberg &
Knupp LLP

13339949.1

137.   The acts and conduct of Defendants constitute unfair competition in the United States under California Business & Professions Code § 17200 *et seq.* and under California common law.

138.   As a direct and proximate result of Defendants' unfair competition in the United States, Plaintiffs have been damaged, and Defendants have been unjustly enriched, in an amount to be proven at trial for which damages and/or restitution and disgorgement is appropriate.  Such damages and/or restitution and disgorgement should include a declaration by this Court that Defendants are constructive trustees for the benefit of Plaintiffs, and an order that Defendants convey to Plaintiffs the gross receipts received or to be received that are attributable to the sale of the Cheating Software in the United States.

139.   Defendants are guilty of oppression, fraud or malice, and Plaintiffs, in addition to their actual damages, by reason thereof, are entitled to recover exemplary and punitive damages against Defendants.

140.   As a result of Defendants' acts and conduct in the United States, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Plaintiffs are informed and believe, and on that basis allege, that unless enjoined and restrained by this Court, Defendants will continue to engage in unfair competition.  Pursuant to California Business & Professions Code § 17203, Plaintiffs are entitled to temporary, preliminary and permanent injunctions prohibiting further acts of unfair competition.

## **COUNT VII**

### **Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.***

141.   Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 140, as if set forth fully herein.

142.   Plaintiffs' Destiny 2 and R6S Servers (the "Game Servers") are computer servers used by Ubisoft to engage in interstate and foreign commerce.  The Game Servers are protected computers under 18 U.S.C. § 1030(e)(2).

Mitchell
Silberberg &
Knupp LLP

13339949.1

CASE NO. 3:21-cv- 5677
**COMPLAINT**

143.     By developing, marketing, distributing and encouraging the use of the Cheating Software, including those portions of the Cheating Software that include HWID Spoofers, Defendants have knowingly aided and abetted, conspired with, or otherwise caused players of Plaintiffs' games to intentionally access the Game Servers without Plaintiffs' authorization. Specifically, Defendants have caused such HWID Spoofers to be used to obtain access to the Game Servers by players that have been specifically prohibited from accessing the Game Servers.  Such conduct has caused damage and/or loss to the Game Servers.

144.     As a result of Defendants' conduct, Plaintiffs have suffered damages in excess of the $5,000 statutory minimum.  Plaintiffs have been damaged by Defendants' actions, including in the form of decreased participation by players in the Games, investigative costs and legal fees, and the expenditure of resources to detect players who access the Game Servers without authorization.

145.     Plaintiffs have also suffered irreparable and incalculable harm and injuries resulting from Defendants' conduct in the form of damages to their customers' goodwill and trust.

146.     On information and belief, Defendants have continued to conspire to obtain unauthorized access to the Game Servers with the intent of harming Plaintiffs and will continue to do so unless enjoined.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor on each and every claim for relief set forth above and award them relief, including but not limited to an order:

1.     Preliminarily and permanently enjoining Defendants, their officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, affiliates, and all persons acting in concert or participation with Defendants from: (i) trafficking in circumvention devices in the United States; (ii) infringing Plaintiffs' copyrighted works in the United States; (iii) infringing Plaintiffs' registered and common law trademarks in the United States, including through falsely representing or suggesting that Plaintiffs sponsored, endorsed, approved, or

Mitchell
Silberberg &
Knupp LLP

13339949.1

35

CASE NO. 3:21-cv- 5677

**COMPLAINT**

1   otherwise are affiliated with Defendants and their products and services; (iv) intentionally

2   interfering with Plaintiffs' contracts with players in the United States; (v) engaging in unfair

3   competition in the United States; and (vi) conspiring with or otherwise assisting others to obtain

4   unauthorized access to Plaintiffs' protected computer servers.

5           2.      Requiring Defendants to shut down the Ring-1 Website, the Cheating Software

6   and any colorable copies thereof, hosted at any domain, address, location, or ISP.

7           3.      Requiring Defendants to deliver to Plaintiffs all copies of materials that infringe

8   or violate any of Plaintiffs' rights, as described herein.

9           4.      Requiring Defendants to provide Plaintiffs with an accounting of any and all sales

10  of products or services in the United States that infringe or violate any of Plaintiffs' rights, as

11  described herein.

12          5.      Awarding Plaintiffs actual damages, or maximum statutory damages of $150,000

13  per copyrighted work infringed – *i.e.*, a total of $300,000 – for copyright infringement pursuant

14  to 17 U.S.C. § 504.

15          6.      Awarding Plaintiffs actual damages, or maximum statutory damages of $2,500

16  per violation of Section 1201 – in an amount to be proven at trial – pursuant to 17 U.S.C. §

17  1203(c)(3).

18          7.      Awarding Plaintiffs compensatory damages for trademark infringement under the

19  Lanham Act and for Defendants' violations of the Computer Fraud and Abuse Act.

20          8.      Awarding Plaintiffs their full costs and attorneys' fees in this action.

21          9.      Awarding Plaintiffs exemplary and punitive damages against Defendants on

22  Plaintiffs' cause of action for intentional interference with contractual relations.

23          10.     Awarding Plaintiffs restitution of Defendants' unlawful proceeds, including an

24  accounting of any and all sales of the Cheating Software in the United States, and/or any other

25  products or services that violate any of Plaintiffs' rights described herein.

26          11.     Imposing a constructive trust over the proceeds unjustly obtained by Defendants

27  through the sale of the Cheating Software in the United States, and/or any other products or

28  services that violate any of Plaintiffs' rights described herein.

Mitchell
Silberberg &
Knupp LLP

13339949.1

36                          CASE NO. 3:21-cv- 5677
**COMPLAINT**

1    12.    Awarding such other and further relief as this Court may deem just and

2    appropriate.

3

4    DATED:  July 23, 2021                    MARC E. MAYER
                                              EMILY F. EVITT
5                                             MARK C. HUMPHREY
                                              MITCHELL SILBERBERG & KNUPP LLP
6

7                                             By:    /s/ *Marc E. Mayer*
                                                     Marc E. Mayer
8                                                    Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Silberberg &
Knupp LLP

13339949.1

28

                                             37                 CASE NO. 3:21-cv- 5677
                                       **COMPLAINT**

1

## JURY DEMAND

2          Plaintiffs demand a trial by jury on all issues so triable.

3

4   DATED:  July 23, 2021                    MARC E. MAYER
                                             EMILY F. EVITT
5                                            MARK C. HUMPHREY
                                             MITCHELL SILBERBERG & KNUPP LLP
6

7                                            By:   */s/ Marc E. Mayer*
                                                   Marc E. Mayer
8                                                  Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

13339949.1

38                     CASE NO. 3:21-cv- 5677
**COMPLAINT**