MARC E. MAYER (SBN 190969), mem@msk.com
EMILY F. EVITT (SBN 261491), efe@msk.com
GENEVIEVE L. JAVIDZAD (SBN 336138), glj@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUNGIE, INC., UBISOFT ENTERTAINMENT, and UBISOFT, INC., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW THORPE a/k/a KRYPTO, an individual; JONATHAN AGUEDA a/k/a OVERPOWERED, an individual; WESAM MOHAMMED a/k/a GRIZZY, an individual; AHMAD MOHAMMED, an individual; and Does 1 through 50, inclusive, <br><br> Defendants. | CASE NO.  3:21-cv-05677-EMC <br><br> [Assigned to Judge Edward M. Chen] <br><br> **NOTICE OF MOTION AND MOTION OF PLAINTIFFS FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANT ANDREW THORPE** <br><br> Date:  January 17, 2023 <br> Time:  2:30 p.m. <br><br> Complaint Filed: July 23, 2021 |

Mitchell
Silberberg &
Knupp LLP

14994646.3

CASE NO. 3:21-cv-05677

1

## NOTICE OF MOTION FOR DEFAULT JUDGMENT

2     **PLEASE TAKE NOTICE THAT** on January 17, 2023, at 2:30 p.m. via

3 Zoom in Courtroom 5 of the United States District Court for the Northern District

4 of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102,

5 Plaintiffs Bungie, Inc., Ubisoft Entertainment, and Ubisoft, Inc. (together,

6 "Plaintiffs") will present their Motion for Default Judgment against Defendant

7 Andrew Thorpe ("Thorpe") pursuant to Local Rules 7-2 and 7-4, and Federal Rule

8 of Civil Procedure 55.  The Court previously entered the default of Defendant

9 Thorpe on April 13, 2022.  ECF 42.

10     This Motion is brought on the grounds that Thorpe has been served, default

11 has been entered, and Thorpe has not appeared in this action.  Plaintiffs seek a

12 permanent injunction, a monetary judgment in the amount of $2,237,760.00, and

13 costs and fees in the amount of $126,505.42.

14     This Motion is based on this Notice, the attached Motion for Default

15 Judgment, the concurrently-filed Declaration of Marc E. Mayer, the Declaration of

16 Marc Muraccini, the Declaration of Dr. Ed Kaiser, PhD, and the exhibits thereto,

17 and the pleadings, files, argument and other matters that may be presented at the

18 hearing.

19

20 DATED: December 13, 2022       MITCHELL SILBERBERG & KNUPP LLP

21

22               By:  /s/ Marc E. Mayer

23                     Marc E. Mayer
                    Attorneys for Plaintiffs

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

14994646.3

2     CASE NO. 3:21-cv-05677

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF FACTS .....................................................................2

III.  THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER
      THORPE.................................................................................................7

    A.   Thorpe And Ring-1 Purposefully Directed Their Activities At The
           United States. .................................................................................9

    B.   Plaintiffs' Claims Arise out of Defendants' U.S. Activity. ...............14

    C.   The Exercise of Jurisdiction is Not Unreasonable..............................14

IV.   PLAINTIFFS ARE ENTITLED TO DEFAULT JUDGMENT ..................16

    A.   Possibility of Prejudice ........................................................16

    B.   Merits of Claim and Sufficiency of Complaint. ................................17

        1.   Trafficking In Circumvention Devices....................................17

        2.   Copyright Infringement ...........................................................18

        3.   Intentional Interference With Contractual Relations................19

    C.   Amount at Stake ...................................................................19

    D.   Possibility of Dispute Regarding Material Facts ................................20

    E.   Possibility of Excusable Neglect .........................................................20

    F.   Policy for Deciding Case on the Merits................................................20

V.    PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION
      AND MONETARY DAMAGES IN THE AMOUNT OF $2,364,265.42...21

    A.   Plaintiffs are Entitled to a Permanent Injunction................................21

    B.   Plaintiffs are Entitled to Damages In The Amount Of $2,237,760. ...22

    C.   Plaintiffs are Entitled to Reasonable Attorneys' Fees and Costs. ......25

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

14994646.3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS
(continued)

**Page**

VI.    CONCLUSION ................................................................................25

Mitchell
Silberberg &
Knupp LLP

14994646.3

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## CASES

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
307 F. Supp. 2d 1085 (N.D. Cal. 2004)...............................................................17

*3DO Co. v. Poptop Software, Inc.*,
1998 WL 962202 (N.D. Cal. Oct. 27, 1998) ......................................................10

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ............................................................................18

*AMA Multimedia LLC v. Sagan Ltd.*,
2016 WL 5946051 (D. Ariz. Oct. 13, 2016) ...............................................14, 15

*Amini Innovation Corp. v. JS Imports, Inc.*,
497 F. Supp. 2d 1093 (C.D. Cal. 2007)...............................................................12

*Ballard v. Savage*,
65 F.3d 1495 (9th Cir. 1995) ..............................................................................14

*Bekins v. Zheleznyak*,
2018 WL 1174997 (C.D. Cal. Mar. 5, 2018) ......................................................17

*Blizzard Ent., Inc. v. Bossland GmbH*,
No. CV 16-1236, 2017 WL 7806600 (C.D. Cal. Mar. 31, 2017) ...............22, 24

*Blizzard Entertainment, Inc. v. Joyfun Inc. Co Ltd.*,
2020 WL 1972284 (N.D. Cal. Feb. 7, 2020) ..................................9, 10, 11, 12

*Blizzard Entm't, Inc. v. Bossland GmbH*,
2017 WL 412262 (C.D. Cal. Jan. 25, 2017)..................................................8, 13

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC*,
28 F. Supp. 3d 1006 (C.D. Cal. 2013)................................................................19

*Blizzard Entm't, Inc. v. Reeves*,
2010 WL 4054095 (C.D. Cal. Aug. 10, 2010) ................................9, 22, 23, 24

*Branca v. Mann*,
No. CV 11-00584 DDP PJWX, 2012 WL 3263610, at *1
(C.D. Cal. Aug. 10, 2012) ...................................................................................18

Mitchell Silberberg & Knupp LLP

14994646.3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Calder v. Jones*,
465 U.S. 783 (1984) ................................................................. 9

*California Brewing Co. v. 3 Daughters Brewing LLC*,
2016 WL 1573399 (April 18, 2016) ...................................... 12

*Chanel, Inc. v. Lin*,
2010 WL 2557503 (N.D. Cal. May 7, 2010) ........................ 22

*Craigslist, Inc. v. Kerbel*,
2012 WL 3166798 (N.D. Cal. Aug. 2, 2012) ................. 19, 21

*Craigslist, Inc. v. Naturemarket, Inc.*,
694 F. Supp. 2d 1039 (N.D. Cal. 2010) ................................ 22

*CYBERsitter, LLC v. People's Republic of China*,
805 F. Supp. 2d 958 (C.D. Cal. 2011) .................................... 9

*Derek Andrew, Inc. v. Poof Apparel Corp.*,
528 F.3d 696 (9th Cir. 2008) ................................................ 17

*Dish Network, L.L.C. v. SatFTA*,
2011 WL 856268 (N.D. Cal. Mar. 9, 2011) .......................... 23

*Eitel v. McCool*,
782 F.2d 1470 (9th Cir. 1986) ....................... 16, 17, 19, 20

*Elektra Entm't Group Inc. v. Crawford*,
226 F.R.D. 388 (C.D. Cal. 2005) .................................. 17, 21

*Elektra Entm't Grp., Inc. v. Bryant*,
2004 WL 783123 (C.D. Cal. Feb. 13, 2004) ............. 16, 17, 21

*Facebook, Inc. v. Grunin*,
77 F. Supp. 3d 965 (N.D. Cal. 2015) .................................... 22

*Goes Int'l, AB v. Dodur Ltd.*,
2015 WL 5043296 (N.D. Cal. Aug. 26, 2015) ........................ 8

*Gucci Am., Inc. v. Huoqing*,
2011 WL 31191 (N.D. Cal. Jan. 3, 2011) ............................ 21

Mitchell
Silberberg &
Knupp LLP

14994646.3

1

## TABLE OF AUTHORITIES
<u>(continued)</u>

2

3

<u>Page(s)</u>

4

*Halo Creative Design Ltd. v. Comptoir Des Indes Inc.*,
   816 F.3d 1366 (Fed. Cir. 2016) ................................................................. 15

5

6

*Indiana Plumbing Supply, Inc. v. Standard of Lynn, Inc.*,
   880 F. Supp. 743 (C.D. Cal. 1995) ........................................................... 15

7

8

*JBR, Inc. v. Cafe Don Paco, Inc.*,
   2014 WL 5034640 (N.D. Cal. Aug. 25, 2014) ........................................ 20

9

10

*Lang Van, Inc. v. VNG Corp.*,
   40 F.4th 1034 (9th Cir. 2022) ........................................................ 8, 11, 12

11

12

*LiveCareer Ltd v. Su Jia Techs. Ltd.*,
   2015 WL 1448505 (N.D. Cal. Mar. 31, 2015) ......................................... 15

13

14

*Marcelos v. Dominguez*,
   2009 WL 230033 (N.D. Cal. Jan. 29, 2009) ............................................ 20

15

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
   647 F.3d 1218 (9th Cir. 2011) ................................................................... 9

16

17

*MDY Indus., LLC MDY v. Blizzard Entertainment, Inc.*,
   629 F.3d 928 (9th Cir. 2010) ................................................................... 18

18

19

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*,
   243 F. Supp. 2d 1073,1087 (C.D. Cal. 2003) ......................................... 12

20

21

*Michael Grecco Prods. v. Netease, Inc.*,
   2019 WL 3245872 (N.D. Cal. July 3, 2019) ........................................... 10

22

23

*Midway Mfg. Co. v. Bandai–America, Inc.*,
   546 F. Supp. 125 (D.N.J.1982) ................................................................ 17

24

25

*Mountz v. Northeast Indus. Bolting & Torque, LLC*,
   2016 WL 6699295 (N.D. Cal. Sept. 30, 2016) ....................................... 13

26

*Nintendo of Am., Inc. v. Dragon Pac. Int'l*,
   40 F.3d 1007 (9th Cir. 1994) ................................................................... 22

27

28

*PepsiCo v. Triunfo-Mex, Inc.*,
   189 F.R.D. 431 (C.D. Cal. 1999) ............................................................ 16

Mitchell
Silberberg &
Knupp LLP

14994646.3

v                    CASE NO. 3:21-cv-05677

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*PepsiCo, Inc. v. Cal. Sec. Cans,*
  238 F. Supp. 2d 1172 (C.D. Cal. 2002).....................................................17, 19, 21

*Perfect 10, Inc. v. Talisman Comm'ns Inc.,*
  No. CV99-10450 RAP, 2000 WL 364813
  (C.D. Cal. March 27, 2000) .........................................................................24

*Rio Props., Inc. v. Rio Int'l Interlink,*
  284 F.3d 1007 (9th Cir. 2002) ....................................................................14

*Schwarzenegger v. Fred Martin Motor Co.,*
  374 F.3d 797 (9th Cir. 2004) ........................................................................9

*Sony Computer Entm't Am., Inc. v. Filipiak,*
  406 F. Supp. 2d 1068 (N.D. Cal. 2005).........................................................23

*TeleVideo Sys., Inc. v. Heidenthal,*
  826 F.2d 915 (9th Cir. 1987) ......................................................................16

*Vault Corp. v. Quaid Software, Ltd.,*
  775 F.2d 638 (5th Cir. 1985) ......................................................................11

*Warner Bros. Entm't Inc. v. Caridi,*
  346 F. Supp. 2d 1068 (C.D. Cal. 2004).....................................................21, 24

**STATUTES**

17 U.S.C.
  § 106 ...............................................................................................................18
  § 504 ..........................................................................................................22, 24
  § 1201 .........................................................................................................*passim*
  § 1203 ......................................................................................................23, 25

Cal. Bus. & Prof. Code
  § 17200 *et seq.*.............................................................................................1, 18

**OTHER AUTHORITIES**

4 Melville B. Nimmer & David Nimmer, Nimmer On Copyright,
  § 12A.13 (Rev. Ed.)........................................................................................23

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

14994646.3

# TABLE OF AUTHORITIES
<u>(continued)</u>

<u>Page(s)</u>

Fed. R. Civ. P.
    4(f)(2)(C)(ii) ................................................................................ 1, 7
    4(k) ...................................................................................... 7, 8, 13, 14
    55 ...................................................................................... 16, 21

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

14994646.3

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

## I.   INTRODUCTION

3     Plaintiffs Bungie, Inc. ("Bungie"), Ubisoft Entertainment, and Ubisoft, Inc.

4  ("Ubisoft," and together with Bungie, "Plaintiffs") are the owners of two of the

5  most popular online multiplayer video games: *Destiny 2* and *Rainbow Six: Siege*

6  (collectively, the "Games").  This action involves the marketing and sale of

7  malicious software products designed to enable members of the public to cheat in

8  the Games.  These products (referred to collectively as the "Cheating Software")

9  have been marketed and sold under the brand name "Ring-1," primarily via the

10 website www.ring-1.io (the "Ring-1 Website") and via a network of authorized

11 resellers around the world.

12    On July 23, 2021, Plaintiffs filed this lawsuit against several individuals

13 identified as the owners, operators, or administrators of the Ring-1 Website.

14 Plaintiffs alleged that each of these individuals was engaged directly in the

15 marketing and sale of the Cheating Software in the United States.  Among these

16 individuals is Defendant Andrew Thorpe (a/k/a "Krypto"; "Thorpe"), an individual

17 residing in North Humberside, United Kingdom.  During the relevant period,

18 Thorpe was one of the highest level administrators of the Ring-1 Website, and in

19 that role was actively involved in advertising, distributing, and offering support for

20 the Cheating Software to members of the public (including U.S. residents).  In

21 doing so, Thorpe engaged in acts in violation of Section 1201 of the Digital

22 Millennium Copyright Act ("DMCA"), copyright infringement, intentional

23 interference with Plaintiffs' contracts with their players (namely, their License

24 Agreements and Terms of Service), and unfair competition in violation of

25 California Business and Professions Code § 17200 *et seq.*

26    Thorpe has been served with, and is fully aware of, the Complaint in this

27 action.  Thorpe was served pursuant to Fed. R. Civ. P. 4(f)(2)(C)(ii) on March 17,

28 2022.  ECF 37.  However, Thorpe chose not to appear in this action (either *pro se*

Mitchell
Silberberg &
Knupp LLP

14994646.3

1   or through counsel) and his default was entered on April 13, 2022.  ECF 42.  By

2   this Motion, Plaintiffs now seek entry of default judgment and an award of both

3   monetary damages and injunctive relief against Thorpe.  As set forth below,

4   default judgment is warranted, and the monetary and non-monetary relief sought

5   herein is wholly justified.[1]

6   **II.     STATEMENT OF FACTS**

7          **Plaintiffs and The Games.**  Plaintiffs are the owners and publishers of the

8   online multiplayer video games "Destiny 2" and "Tom Clancy's Rainbow Six:

9   Siege" ("R6S") (collectively, the "Games").  Compl. ¶ 1.  Bungie, which is based

10  in Bellevue, Washington, is the publisher and owner of exclusive rights in and to

11  Destiny 2.  *Id.* ¶ 9.  Ubisoft, which has its U.S. headquarters in San Francisco,

12  California, is the owner of exclusive U.S. rights in R6S, including the exclusive

13  right to market and distribute R6S in the U.S.  *Id.* ¶¶ 10, 11.

14         Because the Games are highly competitive multiplayer games, a vital part of

15  the player experience is the fairness and integrity of the Games.  *Id.* ¶ 47.  The

16  success of the Games rests in part on Plaintiffs' ability to offer a consistently

17  compelling and fair player experience so that their customers remain invested in

18  the Games and continue to play them.  *Id.* ¶ 46.  If there is a perception that players

19  are cheating or have an unfair advantage, then players will grow frustrated with the

20  Games and stop playing them.  *Id.* ¶ 47.  That, in turn, could disrupt and/or destroy

21  Destiny 2's and R6S's player communities and severely harm Plaintiffs' ability to

22  generate revenue and to maintain, improve, and expand the Games.  *Id.*

23  Accordingly, Plaintiffs invest an enormous amount of time and money to maintain

24  the integrity of the Games, through both technical and contractual means.  *Id.* ¶ 51.

25         *First*, the Games contain a number of technological measures designed to

26

27  [1]  Plaintiffs have settled with the other named defendants, Wesam Mohammed, Ahmad Mohammed, and Jonathan Agueda.  Plaintiffs are continuing to investigate, locate, and serve the "Doe" defendants in this action, and thus do not yet seek entry of judgment against these individuals.

28

1  detect whether players are using software that allows them to cheat in the game.

2  *Id.* ¶¶ 52-54.  When these technological measures identify or detect that a player is

3  using cheating software, the player's account may be suspended or "banned," such

4  that the player may no longer access the game and its remote server.  *Id.* ¶ 55.

5  Thus, for any hack or cheat software to be effective, it must be designed to avoid

6  detection by Plaintiffs' anti-cheat or other access control technology.  *Id.* ¶ 56.

7  *Second*, in order to access, download, or play the Games, users must create

8  and register accounts with Bungie or Ubisoft and agree to written license

9  agreements and terms of use.  *Id.* ¶ 57.  Upon downloading the Destiny 2 client and

10  beginning installation, users must expressly manifest their assent to Bungie's

11  Limited Software License Agreement ("SLA").  *Id.* ¶ 58.  Similarly, upon

12  downloading R6S and beginning installation, players are required to expressly

13  manifest their assent to the "Ubisoft Terms of Use" and End-User License

14  Agreement (collectively, the "TOU"), and also to the "Rainbow Six: Siege Code of

15  Conduct" (the "Code of Conduct").  *Id.*  (The SLA, TOU, and Code of Conduct are

16  referred to collectively as the "License Agreements").  The entire text of the

17  License Agreements is displayed to users at the time they register for a Bungie or

18  Ubisoft account while installing Destiny 2 or R6S.  *Id.*

19  The License Agreements for both Destiny 2 and R6S clearly and specifically

20  prohibit the use of cheats and hacks such as the Cheating Software.  *Id.* ¶ 86.  For

21  example, the Destiny 2 SLA states that players may not "hack or modify [Destiny

22  2], or create, develop, modify, distribute, or use any unauthorized software

23  programs to gain advantage in any online or multiplayer game modes."  *Id.* ¶ 59.

24  Likewise, the R6S Code of Conduct expressly forbids "[a]ny attempt to edit,

25  corrupt or change Game or server code," and "use of third-party hacking, cheating

26  or botting clients."  *Id.* ¶ 62.

27  Destiny 2 and R6S are made available to the public exclusively through

28  proprietary servers and matchmaking systems.  *Id.* ¶ 60, 63.  Access to these

Mitchell
Silberberg &
Knupp LLP
14994646.3

1    servers requires assent to the License Agreements.  *Id.*  Thus, it is not possible for a

2    user to lawfully obtain access to or play either Destiny 2 or R6S without expressly

3    consenting to the TOU and Code of Conduct.  *Id.*

4        **Ring-1 and The Cheating Software.**  Andrew Thorpe was one of the

5    primary participants in an online business venture called "Ring-1."  Declaration of

6    Marc E. Mayer ("Mayer Decl."), ¶¶ 2, 13-14.  Via the Ring-1 Website, Ring-1

7    (acting through Thorpe and others) is engaged in the development, sale,

8    distribution, marketing, and exploitation of a portfolio of malicious cheats and

9    hacks for popular multiplayer games, including the Cheating Software.  *Id.* ¶ 2.

10   The Cheating Software purports to enable players of the Games to gain

11   competitive advantages in the Game by, *inter alia*, causing the player's aim to

12   "snap" to an opponent when they appear onscreen, allowing players to hide

13   information about the systems they are running in order to avoid detection by anti-

14   cheat software, and allowing players to see information that they normally would

15   not be able to during a Destiny 2 or R6S game.  Compl. ¶ 77.

16       Among the key "features" of the Cheating Software promoted and touted by

17   the Ring-1 Website is that the Cheating Software has been designed to avoid

18   Plaintiffs' technological detection measures.  *Id.* ¶ 54.  For example, the Ring-1

19   Website describes its "Destiny 2 Cheat" as "[k]nown to be the safest cheat

20   around."  Mayer Decl. ¶ 3.  Marketing materials for the Destiny 2 cheat also

21   describe it has being "supported" for (*i.e.*, undetected by) "BattlEye," which is

22   commercial anti-cheat software used by Bungie to protect Destiny 2.  *Id.* ¶ 4.  The

23   Ring-1 Website even contains a "status" page (depicted below) confirming that the

24   Cheating Software is "undetected," *i.e.*, "it is safe to use and the anti-cheat will not

25   detect it."  *Id.* ¶ 5.

26



27

28

Mitchell
Silberberg &
Knupp LLP

14994646.3

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

1    The Ring-1 Website is entirely in English, and all prices currently are listed

2  in U.S. dollars.  *Id.* ¶ 6.  The Website sells licenses for the R6S Cheating Software

3  for $7.00 per day, $21.00 per week, and $50.00 per month.  *Id.* ¶ 7.  It offers two

4  versions of the Destiny 2 Cheating Software (the normal and "pro" versions).  *Id.*

5  A license for the normal version of the Destiny 2 Cheating Software is sold for

6  $8.00 per day, $26.00 per week, and $60.00 per month, while the "pro" version is

7  $16.00 per day, $51.00 per week, and $120.00 per month.  *Id.*  The Cheating

8  Software has been downloaded and used by players thousands of times, including

9  by players residing in the United States and in California.  Compl. ¶ 67.

10    Ring-1 makes (or has made) extensive use of Internet services in the United

11  States.  Mayer Decl. ¶ 8.  The Ring-1.io domain name was registered through a

12  U.S. domain name registrar, NameSilo, located in Phoenix Arizona.  *Id.*  Certain

13  subdomains for the Ring-1 Website (including those pertaining to payment) are

14  hosted by Digital Ocean, located in New York.  *Id.* ¶ 9.  Additionally, until 2021,

15  Ring-1 used a Michigan-based payment processor known as "Lexpay."  (It

16  apparently ceased using that service only after Lexpay's owner, Kevin Nemeth,

17  was arrested or imprisoned.)  *Id.* ¶ 10.  Furthermore, as discussed below, Ring-1's

18  operators communicate with the public using the social media platform Discord,

19  based in San Francisco, California.  *Id.* ¶ 11.

20    **Defendant Andrew Thorpe.**  Based on Plaintiffs' investigation, "Ring-1" is

21  not a formal legal entity, and is not owned or controlled by a partnership or

22  corporate entity.  *Id.* ¶ 14.  Rather, Ring-1 appears to be a business enterprise run

23  and managed by a collection of individuals working together toward a common

24  purpose.  *Id.*  Some of these individuals are responsible for developing (i.e.

25  programming) the Cheating Software, while others are responsible for operating

26  the Ring-1 website, overseeing the "marketing" for the Cheating Software, acting

27  on behalf of Ring-1 in interactions with the public, and selling the Cheating

28  Software or managing the distribution network.  Compl. ¶ 64.

Mitchell
Silberberg &
Knupp LLP

14994646.3

5       CASE NO. 3:21-cv-05677
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

1    The operators of Ring-1 have gone to great lengths to conceal their identities

2  from law enforcement and rights owners such as Plaintiffs.  Mayer Decl., ¶ 14.  For

3  example, Ring-1 registered the domain name for the Ring-1 Website (www.ring-

4  1.io) and purchased hosting services through a "bulletproof hosting" company

5  known as "NiceVPS."  *Id.* ¶ 12.  NiceVPS is an anonymously run company that

6  prides itself on serving "high risk businesses," does not "ask you too many

7  questions" and "will NOT reply to any abuse complaint."  *Id.* ¶ 12.  Nevertheless,

8  after extensive research, Plaintiffs were able to determine that, during the relevant

9  time period, the Ring-1 Website was being run by defendants Andrew Thorpe

10 (a/k/a "Krypto") and Jonathan Agueda (a/k/a "Overpowered").  *Id.* ¶ 14.  Agueda

11 resides in Florida, has appeared in this action through counsel, and has reached a

12 settlement with Plaintiffs.  *Id.* ¶ 15.  Thorpe resides in the United Kingdom and is

13 aware of this lawsuit, but has elected not to appear.  *Id.*

14    Thorpe is (or at all relevant times has been) one of the lead and most

15 prominent staff members and moderators of the Ring-1 Website.  *Id.*  As Agueda

16 stated in one message board post:  "The devs [developers] own the website, and

17 myself and [Thorpe] ***run it for them***."  (Emphasis added.)  *Id.* ¶ 17.  In his role

18 "running" the Ring-1 Website, Thorpe has been the public "face" of Ring-1 and

19 played a key role in the day-to-day operations of the Ring-1 Website.  *Id.*  Thorpe

20 has communicated with Plaintiffs' customers in order to support and enable their

21 use of the Cheating Software.  *Id.*  Specifically, Thorpe assists customers in

22 operating the Cheating Software and gives advice to customers as to how to avoid

23 being caught or detected by Plaintiffs for using the Cheating Software.  *Id.*  He also

24 serves as liaison between members of the public and the developers of the

25 Cheating Software, sometimes updating customers as to the status of changes or

26 fixes to the Cheating Software.  *Id.*  He thus is directly responsible for ensuring

27 that the Cheating Software not only is made available to the public, but also is used

28 by customers to cheat in Plaintiffs' Games.  *Id.*  Additionally, Thorpe has managed

Mitchell
Silberberg &
Knupp LLP

14994646.3

6                    CASE NO. 3:21-cv-05677
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

or overseen a network of "resellers," who sell licenses for the Cheating Software on behalf of the Ring-1 enterprise.[2]

On February 12, 2021, Activision Publishing, Inc. (a video game publisher located in Santa Monica, California) delivered a letter to Thorpe demanding that he cease and desist from any further participation in the marketing, distribution, and sale of software used to cheat in Activision's *Call of Duty* series of games. *Id.* ¶ 16. In response to the letter, Thorpe changed his online alias from "Krypto" to "Cypher," but otherwise continued to operate and oversee the Ring-1 Website. *Id.*

**Procedural History And Service.** Plaintiffs filed the Complaint on July 23, 2021. ECF 1. On or about October 4, 2021, Plaintiffs requested that the Clerk of the Court serve Thorpe by mail, pursuant to Fed. R. Civ. P. 4(f)(2)(C)(ii). On October 21, 2021, Plaintiffs received notice that the Complaint had been served by the clerk. ECF 19. The Court entered default as to Defendant Andrew Thorpe on April 13, 2022. ECF 41, 42. On September 12, 2022, the filings and orders related to Thorpe's default were served upon him, and Plaintiffs filed the Proof of Service thereof on the same day. ECF 57.[3]

## III. THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER THORPE.

As a threshold matter, while Thorpe resides in the United Kingdom, this Court has specific jurisdiction over Thorpe via the federal long-arm statute (Rule 4(k)(2)) by virtue of his direct and active participation in the distribution, marketing, monetization, support, and other exploitation of the Cheating Software

---

[2] Thorpe's communications with the public have taken place through the Ring-1 online "forum," through the Discord social media network, and via private messages.

[3] On March 3, 2022, Plaintiffs filed an *ex parte* application requesting entry of default against Thorpe. ECF 32. However, on March 9, 2022, the Court denied the application without prejudice because the clerk had not received a signed acknowledgement. ECF 33. Thus, Plaintiffs re-submitted the Complaint to the Court for renewed service on Thorpe. On March 17, 2022, Thorpe received the Complaint and Plaintiffs received a signed acknowledgement attesting to his receipt of summons. ECF 37.

in the United States on behalf of the Ring-1 enterprise.  In doing so, Thorpe not only targeted the U.S. market (which hosts the largest player base for Destiny 2 and R6S) but also specifically targeted Plaintiffs and their Games.

Under Fed. R. Civ. P. 4(k)(2), personal jurisdiction over a defendant is established if the claims arise under federal law and:

> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.

The burden then shifts to the defendant to show application of jurisdiction would be unreasonable.  *Lang Van, Inc. v. VNG Corp.*, 40 F.4th 1034 (9th Cir. 2022).  All of the required elements are met, and exercising jurisdiction would be reasonable.

Plaintiffs' claims for trafficking in circumvention devices, copyright infringement, trademark infringement, and false designation of origin arise under federal law.  Additionally, Thorpe has not consented to jurisdiction in any state.  Thus, personal jurisdiction is proper as long as the exercise of jurisdiction is consistent with due process under the United States Constitution.  The "due process analysis under Rule 4(k)(2) is nearly identical to the traditional personal jurisdiction analysis with one significant difference: rather than considering contacts between the [defendants] and the forum state, we consider contacts with the nation as a whole." *Lang Van, Inc.*, 40 F.4th at 1039.  *See also Goes Int'l, AB v. Dodur Ltd.*, 2015 WL 5043296, at *7-8 (N.D. Cal. Aug. 26, 2015) (same); *Blizzard Entm't, Inc. v. Bossland GmbH*, 2017 WL 412262, at *4 (C.D. Cal. Jan. 25, 2017) (same).

Under this Circuit's test for specific personal jurisdiction, Plaintiffs need only make a *prima facie* case that (1) the nonresident defendant has (a) purposefully directed his activities at the forum [the United States] or (b) purposefully availed himself of the privilege of conducting activities in the forum; and (2) the claim arises out of or relates to the defendant's forum-related activities.

Mitchell
Silberberg &
Knupp LLP

14994646.3

8                   CASE NO. 3:21-cv-05677
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

*Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir. 2004). Once Plaintiffs have done so, the burden then shifts to the Defendant to present a "compelling case" that the exercise of jurisdiction would "not be reasonable." *Id.*

Thorpe's refusal to participate in this litigation has denied Plaintiffs the opportunity to take discovery concerning Thorpe and the scope of his activities. As such, the allegations of the Complaint must be taken as true, and all inferences must be construed in Plaintiffs' favor. *Blizzard Entm't, Inc. v. Reeves,* 2010 WL 4054095, at *3 (C.D. Cal. Aug. 10, 2010). Plaintiffs' uncontested allegations, bolstered by their independent research, confirms that the exercise of personal jurisdiction is appropriate.

### A. Thorpe And Ring-1 Purposefully Directed Their Activities At The United States.

The first inquiry is whether Defendant Thorpe "purposefully directed" his activities at the United States. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011). To establish "purposeful direction," this Court applies the three-part "effects" test derived from *Calder v. Jones*, 465 U.S. 783 (1984). This test "requires that the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix,* 647 F.3d at 1228 (internal citations and quotation marks omitted).

**Intentional Acts.** Thorpe engaged in several "intentional acts" – *i.e.*, "actual, physical act[s] in the real world." *CYBERsitter, LLC v. People's Republic of China*, 805 F. Supp. 2d 958, 969 (C.D. Cal. 2011). Thorpe managed, administered, and oversaw the operation of the Ring-1 Website, whose sole purpose was to market, advertise, distribute and sell the Cheating Software. Mayer Decl. ¶¶ 14-18. *See Joyfun*, 2020 WL 1972284 at *6 (intentional acts include "advertising the Infringing Game via platforms like Facebook"). Thorpe directly engaged with potential and actual customers of the Cheating Software, advising

Mitchell
Silberberg &
Knupp LLP

14994646.3

them how to circumvent Plaintiffs' anti-cheat technology and how to not get caught breaching the License Agreements.  Mayer Decl., ¶¶ 17-18.  Thorpe posted announcements about upcoming features and updates to the Cheating Software.  *Id.*  Moreover, Thorpe was the person who hired and oversaw support staff for the Ring-1 Website.  *Id.*

Thorpe also directly coordinated with other participants in the Ring-1 enterprise in order to ensure that the Cheating Software was distributed and sold.  As a participant in the Ring-1 enterprise, Thorpe is jointly liable for the overall conduct of that enterprise.  *See Joyfun*, at \*7 ("Blizzard alleges that [defendants] worked together… to distribute, market, advertise, and support the Infringing Game in the United States."); *Michael Grecco Prods. v. Netease, Inc.*, 2019 WL 3245872, \*1 (N.D. Cal. July 3, 2019) (parent and subsidiary "worked together" to infringe plaintiff's works).

**Express Aiming.**  Thorpe's intentional acts were aimed at the United States in at least the following respects:

*First*, via the Ring-1 Website, Thorpe and others caused (and took steps to ensure) that the Cheating Software was distributed extensively into the U.S. market.  Complaint, ¶ 67.  *See 3DO Co. v. Poptop Software, Inc.*, 1998 WL 962202, at \*3 (N.D. Cal. Oct. 27, 1998) ("Defendants have posted a website, accessible by California residents, which permits users to download copies of the *Tycoon II* Demo.").  Plaintiffs' preliminary investigation has revealed that it has ***detected*** at least 597 Ubisoft players and at least 1,099 Bungie players using the Cheating Software in the United States.  Declaration of Marc Muraccini ("Muraccini Decl.") ¶ 8; Declaration of Ed Kaiser ("Kaiser Decl.") ¶ 8.  It is almost certain that this is just a small fraction of the overall number of people using the Cheating Software, since Ring-1 claims that the Cheating Software is "undetect[able]."  Mayer Decl., ¶¶ 3-5.  More than 32% of Ubisoft users and 43% of Bungie users banned for using the Cheating Software were from the United

Mitchell
Silberberg &
Knupp LLP

14994646.3

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

States.[4]  *Id.* ¶ 19.  The penetration of the Cheating Software into the U.S. market was not random or fortuitous.  Rather, the Ring-1 Website targeted U.S. users and the large U.S. player base for Plaintiffs' Games.  The Ring-1 Website is (and at all times was) written entirely in English.  All of the message boards are in English. *Id.* ¶ 6.  *Joyfun*, 2020 WL 1972284 at *6 (express aiming where defendant, among other things, provided English-language chat rooms, and communicated with users via Discord).  Prices currently are displayed in U.S. dollars (and *only* U.S. dollars). *Id.* ¶ 6.

Thorpe and others also made no attempt or effort to restrict or limit the ability of U.S. users to access the website and purchase the Cheating Software, such as by geoblocking or filtering out U.S. users.  *See Lang Van*, 40 F.4th at 1042 ("VNG clearly did not attempt to limit U.S. users' ability to access its website, even though deposition testimony indicates that it had the ability to geoblock users as of 2013, if not earlier."); *Vault Corp. v. Quaid Software, Ltd.*, 775 F.2d 638, 640 (5th Cir. 1985) (personal jurisdiction proper where defendant "made no attempt to limit the states in which its product was marketed").  Thorpe and those working in concert with him made sure that U.S. users had full access to the Cheating Software, such as by accepting credit cards in wide use in the United States (*i.e.*, Visa and Mastercard) and hiring and working with resellers in the United States such as Ahmad and Wesam Mohammed.  Complaint, ¶¶ 15-16.

**Second**, Thorpe (and the customer support personnel who he hired and oversaw) directly communicated with Ring-1 customers, including customers located in the United States.  Complaint, ¶¶ 13, 68.  Thorpe specifically advised these customers how to use the Cheating Software without being caught by Plaintiffs.  Mayer Decl. ¶¶17-18.  As a result, Thorpe directly interfered with the

---

[4]  Notably, 12 people left reviews for Ring-1 on the review website "Trustpilot." Of those, 7 (58%) were self-identified as living in the United States.  Mayer Decl. ¶ 19.  While this is obviously a small sample, it is consistent with Plaintiffs' own market share estimates.

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

14994646.3

1   U.S.-based contractual relationship between Plaintiffs and their U.S. customers.

2   *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 243 F. Supp. 2d 1073,1087

3   (C.D. Cal. 2003) ("whether the defendant encouraged residents of the forum state

4   to engage in relevant contacts with the defendant" and "whether the defendant

5   exchanged messages with forum residents..." are relevant factors).

6          ***Third***, and perhaps most critically, through the marketing and sale of the

7   Cheating Software, Thorpe and those working in concert with him "individually

8   targeted" Bungie and Ubisoft – two U.S. companies.  *See Lang Van*, 40 F.4th at

9   1041 ("VNG purposefully targeted American companies and their intellectual

10  property."); *Amini Innovation Corp. v. JS Imports, Inc.*, 497 F. Supp. 2d 1093,

11  1106 (C.D. Cal. 2007) (specific jurisdiction exists "where a plaintiff brings suit in

12  its home forum against an out-of-state defendant, alleging that the defendant

13  engaged in infringing activities knowing that plaintiff was located in the forum").

14  *See also Burri Law*, at *7 (express aiming when conduct is "for the very purpose of

15  having their consequences felt in the forum state.")

16         Ring-1 directly targets Plaintiffs (and their intellectual property) in their

17  marketing, which makes extensive use of Plaintiffs' trademarks and other imagery.

18  Compl, ¶ 72.  *See, e.g., Blizzard Entertainment, Inc. v. Joyfun Inc. Co Ltd.,* 2020

19  WL 1972284, *6 (N.D. Cal. Feb. 7, 2020) (defendants included brand names

20  "Warcraft" and "Blizzard" in their website html code); *California Brewing Co. v. 3*

21  *Daughters Brewing LLC*, 2016 WL 1573399, *4 (April 18, 2016) ("CBC alleges

22  defendants have used plaintiff's mark for the purpose of promoting defendants'

23  business.").  But that is just the tip of the iceberg.  The Cheating Software, ***by***

24  ***design***, is intended to interact with and harm Plaintiffs' software.  The Cheating

25  Software has absolutely no purpose ***but*** to harm Plaintiffs' Games; they cannot be

26  used with any products other than Plaintiffs' Games; they cannot be used without

27  circumventing Plaintiffs' anti-cheat software and technological access-control

28

Mitchell
Silberberg &
Knupp LLP

14994646.3

12          CASE NO. 3:21-cv-05677
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

1   measures; and they cannot be used without breaching Plaintiffs' License

2   Agreements.

3   *Bossland*, 2017 WL 412262, is directly on point.  In *Bossland*, the video

4   game publisher Blizzard brought claims against a German-based company engaged

5   in the development and distribution of cheating software designed for Blizzard

6   online games.  The defendant moved to dismiss for lack of personal jurisdiction.

7   Applying Rule 4(k), the Court denied the motion, finding that the sale of cheating

8   software was an "intentional act," and that by selling that software in the United

9   States defendant had aimed its conduct at the United States – and at Blizzard in

10  particular.  The Court specifically noted that the cheating software was designed

11  for the purpose of harming Blizzard and its games:

12
13      "Bossland's business is parasitic in nature – it functions
        by piggybacking on Blizzard's sale of its games and
14      undermining the gaming environment Blizzard is seeking
        to create.  But like a direct competitor, Bossland's actions
15      are pointedly undermining Blizzard's brand and
        profitability.  Indeed, Bossland's activity is even more
16      intermeshed with Blizzard's business than a direct
        competitor's would be, as Bossland's products can be
17      used only after a person has already purchased a Blizzard
18      game." *Bossland,* 2017 WL 412262 at *6.

19

20  **Foreseeable Harm.**   It was obviously foreseeable (and Thorpe plainly

21  foresaw) that by promoting and selling the Cheating Software he would be causing

22  harm to Plaintiffs, which are based in or have major offices in the United States.

23  Indeed, the entire *raison d'etre* of the Cheating Software is to harm Plaintiffs.

24  *Bossland,* 2017 WL 412262 at *4 ("Bossland had to anticipate that Blizzard, a

25  company well known to be based in the United States, would suffer loss in the

26  United States as a result of Bossland's software.").  *See also Mountz v. Northeast*

27  *Indus. Bolting & Torque, LLC*, 2016 WL 6699295, at *5 (N.D. Cal. Sept. 30, 2016)

28  ("Where… a party brings a claim for infringement of intellectual property, [i]t is

Mitchell
Silberberg &
Knupp LLP

14994646.3

13            CASE NO. 3:21-cv-05677
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

1  foreseeable that the loss will be inflicted both in the forum where the infringement

2  took place . . . and where the copyright holder has its principal place of business.")

3  **B.      Plaintiffs' Claims Arise out of Defendants' U.S. Activity.**

4          For this prong of the jurisdictional analysis, the Ninth Circuit applies a "but

5  for" test, which requires the plaintiff to demonstrate that its claims would not have

6  occurred but for defendant's contacts with the forum state.  *Ballard v. Savage*, 65

7  F.3d 1495, 1500 (9th Cir. 1995).  That test easily is met here.  U.S. players would

8  not have downloaded and used the Cheating Software while playing the Games if it

9  were not for the Ring-1 Website, which Thorpe ran and administered.  *See, e.g.,*

10 *AMA Multimedia LLC v. Sagan Ltd.*, 2016 WL 5946051, at *5-6 (D. Ariz. Oct. 13,

11 2016) (Rule 4(k)(2) "but for" test satisfied because "[defendant's website]

12 anticipated, desired and achieved a substantial [United States] viewer base with the

13 intent of commercial gain. …  [The website's] alleged infringement of [plaintiff's]

14 copyrighted works would serve only to further the purpose of growing the United

15 States viewership for commercial gain.  What is more, [defendant's website]

16 specifically targeted [plaintiff's] content, knowing [plaintiff] was a United States

17 company protected by United States copyright laws, and proceeded to post that

18 content in the United States....").

19 **C.      The Exercise of Jurisdiction is Not Unreasonable.**

20         The Ninth Circuit considers seven factors in determining reasonableness.

21 *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1021 (9th Cir. 2002)

22 (listing factors).  Not one of the factors weighs against jurisdiction.

23 **(i)      Extent of Purposeful Interjection**.  Thorpe injected himself into the

24 U.S. market by marketing and promoting the Cheating Software, causing it to be

25 distributed in the U.S., and offering support to U.S. customers.  He did so with the

26 intent to harm Plaintiffs.  *See AMA Multimedia v. Sagan Limited*, 2016 WL

27 5946051, at *5 (defendant's website targeted the U.S. market).

28

Mitchell
Silberberg &
Knupp LLP

14994646.3

14      CASE NO. 3:21-cv-05677
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

1    **(ii)    Burden of Defending in the Forum.**  "[I]n almost any case where the

2    defendant does not reside in the forum state, some additional inconvenience is

3    inevitable."  *Indiana Plumbing Supply, Inc. v. Standard of Lynn, Inc.*, 880 F. Supp.

4    743, 748 (C.D. Cal. 1995).  Thorpe decided not to appear in the case, and thus has

5    not offered any evidence to support a claim that it would be "extremely

6    burdensome" for him to defend this action in the United States.

7    **(iii)    Extent of Conflict With the Sovereignty of the Defendant's State.**

8    There is no conflict with the sovereignty of the United Kingdom.  The Complaint

9    addresses Defendants' violations of Plaintiffs' rights in the ***United States***.  *See*

10   *LiveCareer Ltd v. Su Jia Techs. Ltd.*, 2015 WL 1448505, at *9 (N.D. Cal. Mar. 31,

11   2015) ("Here, although Cyprus has some interest in regulating the conduct of its

12   corporations, [plaintiff's] complaint only raises questions of U.S. law.").  This

13   Court need not adjudicate any issues of United Kingdom law.

14   **(iv)    Forum State's Interest in Adjudicating the Dispute.**  "The United

15   States has a significant interest in resolving disputes of United States copyright law

16   involving infringement by foreign defendants."  *AMA Multimedia*, 2016 WL

17   5946051, at *7.  The United States courts have a particular interest in protecting

18   Plaintiffs, which are U.S. companies with a significant U.S. presence.

19   **(v)    Most Efficient Judicial Resolution of the Controversy.**  Because

20   this dispute involves infringements in the U.S., under U.S. copyright law, a court in

21   the United Kingdom cannot as effectively or efficiently decide the issues presented

22   here.  *See Halo Creative Design Ltd. v. Comptoir Des Indes Inc.,* 816 F.3d 1366,

23   1371 (Fed. Cir. 2016) ("[T]here is no indication that Canadian citizens could

24   successfully sue in Canada with respect to exclusively extraterritorial

25   infringement.").

26   **(vi)    Importance of the Forum to the Plaintiff's Interest in Convenient**

27   **and Effective Relief.**  As discussed above, Plaintiffs can only effectively and

28   conveniently obtain relief for their U.S. federal law claims in a U.S. Court.

Mitchell
Silberberg &
Knupp LLP

14994646.3

15        CASE NO. 3:21-cv-05677
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

1    **(vii)  Existence of an Alternative Forum.**  There is no alternative forum,

2  and no evidence that this matter could be handled effectively by a UK court.

3  **IV.    PLAINTIFFS ARE ENTITLED TO DEFAULT JUDGMENT**

4          A court's decision to grant default judgment is guided by the procedural

5  requirements set forth in Fed. R. Civ. P. 55(b)(2), and the following factors (*i.e.*,

6  the *Eitel* factors):

7          (1) the possibility of prejudice to the plaintiff, (2) the merits of
          plaintiff's substantive claim, (3) the sufficiency of the complaint,
8          (4) the sum of money at stake in the action, (5) the possibility of a
          dispute concerning material facts, (6) whether the default was due
9          to excusable neglect, and (7) the strong policy underlying the
10         Federal Rules of Civil Procedure favoring decisions on the merits.

11

12  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  While the decision to

13  grant a default judgment is left to the sound discretion of the Court, "default

14  judgments are more often granted than denied."  *PepsiCo v. Triunfo-Mex, Inc.*, 189

15  F.R.D. 431, 432 (C.D. Cal. 1999).

16          In determining whether to grant a default judgment, "[t]he general rule of

17  law is that upon default the factual allegations of the complaint, except those

18  relating to the amount of damages, will be taken as true."  *TeleVideo Sys., Inc. v.*

19  *Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987).  While a plaintiff must "prove

20  up" damages when seeking a default judgment, this evidentiary burden is

21  "relatively lenient."  *Elektra Entm't Grp., Inc. v. Bryant,* 2004 WL 783123, at *2

22  (C.D. Cal. Feb. 13, 2004).  Plaintiffs have satisfied the procedural requirements of

23  the Federal Rules, the *Eitel* factors weigh in favor of entering default judgment

24  against Thorpe, and the requested relief is both reasonable and supported.

25          **A.     Possibility of Prejudice**

26          The first *Eitel* factor considers whether Plaintiffs will suffer prejudice if

27  default judgment is not entered.  *Eitel*, 782 F.2d at 1471-72.  Prejudice exists

28  where, absent entry of a default judgment, the plaintiff would lose the right to a

Mitchell
Silberberg &
Knupp LLP

14994646.3

1   judicial resolution of its claims and would be without other recourse.  *See Elektra*

2   *Entm't Group Inc. v. Crawford*, 226 F.R.D. 388, 392 (C.D. Cal. 2005); *Bryant*,

3   2004 WL 783123, at *3.  Without a default judgment, Plaintiffs will be deprived of

4   the right to judicial resolution of their claims, and Thorpe will have profited from

5   his illegal conduct with impunity.  *See, e.g.*, *Bekins v. Zheleznyak*, 2018 WL

6   1174997, at *2 (C.D. Cal. Mar. 5, 2018) (possibility of prejudice where defendants

7   "have failed to defend this action" and as a result "plaintiffs would be without

8   other recourse for recovery unless default judgment is entered.").

9          **B.      Merits of Claim and Sufficiency of Complaint.**

10          The second and third *Eitel* factors "require that a plaintiff state a claim on

11   which the [plaintiff] may recover."  *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp.

12   2d 1172, 1175 (C.D. Cal. 2002).  As noted above, all allegations are deemed true.

13   *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008).

14   Plaintiffs have stated claims for, *at minimum*, violation of Section 1201 of the

15   DMCA, copyright infringement, and intentional interference with contract.[5]

16          **1.      Trafficking In Circumvention Devices.**  Section 1201(a)(2) of

17   the Copyright Act prohibits the trafficking of technology "primarily designed" or

18   "marketed" for use in circumventing a technological measure that effectively

19   controls access to a copyrighted work.  *See 321 Studios v. Metro Goldwyn Mayer*

20   *Studios, Inc.*, 307 F. Supp. 2d 1085, 1094 (N.D. Cal. 2004).  Destiny 2 and R6S are

21   copyrighted works.  *Midway Mfg. Co. v. Bandai–America, Inc.*, 546 F. Supp. 125,

22   139 (D.N.J.1982) ("video games in general are entitled to copyright protections as

23   audiovisual works.").  The Games use technological measures that are designed to

24   detect the use of the Cheating Software and deny access to each game to

25

26

27   _____

[5] Plaintiffs also asserted claims for trademark infringement and unfair competition.
28   Plaintiffs have not included these claims in this motion, as their adjudication would
     not significantly impact the amount of the default judgment.

Mitchell
Silberberg &
Knupp LLP

14994646.3

1    individuals using such software.  Such technological measures effectively control

2    access to the Games and their dynamic audiovisual elements.

3    The Cheating Software contains technologies, products, services, devices,

4    components, or parts thereof that primarily are designed or produced for the

5    purpose of circumventing technological measures that effectively control access to

6    the Games.  *See MDY Indus., LLC MDY v. Blizzard Entertainment, Inc*., 629 F.3d

7    928, 953-54 (9th Cir. 2010).  The Cheating Software (and/or the portions thereof

8    that circumvent the Games' anti-cheat technologies) have no commercially

9    significant purpose or use other than to circumvent a technological measure that

10   effectively controls access to Destiny 2 or R6S and that protects the exclusive

11   rights of Plaintiffs.  Without such circumvention measures, the Cheating Software

12   cannot be used and will not operate, including because it will be detected and the

13   user will be denied access to one of the Games.  Additionally, marketing on the

14   Ring-1 Website specifically touts and advertises that the Cheating Software is

15   "safe" and cannot be detected by Plaintiffs.  As a result of the foregoing,

16   Defendant Thorpe is offering to the public, providing, importing, or otherwise

17   trafficking in technology that violates 17 U.S.C. § 1201(a)(2).[6]

18   **2.    Copyright Infringement**.  To prevail on a claim for copyright

19   infringement, the plaintiff must demonstrate (1) ownership of the works infringed,

20   and (2) that defendant violated at least one exclusive right under 17 U.S.C. § 106.

21   *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

22   Plaintiffs sufficiently alleged, and there can be no dispute, that Plaintiffs are the

23   owners of copyright in the Games, including all of the artwork contained therein.

24   Thorpe infringed, or participated in infringing, Plaintiffs' Games by reproducing

25   and publicly displaying "key art" (i.e. promotional artwork) from the Games on the

26   Ring-1 Website without Plaintiffs' authorization.  *See Branca v. Mann*, No. CV

27

---

[6] Such conduct is also unlawful in violation of California Civil Code Section 17200
(Plaintiffs' sixth cause of action).

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

Mitchell
Silberberg &
Knupp LLP
14994646.3

28

11-00584 DDP PJWX, 2012 WL 3263610, at *1 (C.D. Cal. Aug. 10, 2012) (infringement where defendants displayed copyright protected "key art" from the movie "This Is It" and an image of Michael Jackson performing a dance move").

3.    **Intentional Interference With Contractual Relations.**  "In California, the elements . . . for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1015 (C.D. Cal. 2013) (internal quotation marks and citation omitted).  The License Agreements are enforceable contracts under California law.  *Ceiling Fan*, 28 F. Supp. 3d at 1015 (granting summary judgment against hack maker for inducing breach of Blizzard's EULA); Each time a customer uses the Cheating Software, he or she breaches those License Agreements.  Thorpe intentionally encouraged and induced users to purchase and use the Cheating Software, knowing that the software was a breach of the License Agreements.  Plaintiffs suffered a loss of goodwill, incurred expenses in order to detect and prevent the use of the Cheating Software, and suffered a decrease in their profits.

**C.    Amount at Stake**

Under the fourth *Eitel* factor, "the court must consider the amount of money at stake in relation to the seriousness of [d]efendant's conduct." *PepsiCo, Inc.*, 238 F. Supp. 2d at 1176.  As further detailed below, Plaintiffs are seeking an award of $2,364,265.42.  *See Craigslist, Inc. v. Kerbel*, 2012 WL 3166798 (N.D. Cal. Aug. 2, 2012) (granting motion for default judgment and awarding $200,000 in statutory damages under the DMCA and $33,196.70 in damages for trademark infringement in case involving circumvention of security and copyright protection measures).  Here, the amount of money sufficient to remedy Plaintiffs' injury would be

1   extremely difficult to quantify; but it is indisputable such amount would be large.

2   Therefore, the money at stake by this Motion is nowhere near an amount that

3   would compensate Plaintiffs for the seriousness of Defendant's conduct.

4       **D.    Possibility of Dispute Regarding Material Facts**

5           The fifth *Eitel* factor requires the Court to consider the possibility of a

6   dispute as to a material fact. *Eitel*, 782 F.2d at 1471-72. As a threshold matter,

7   there is no possible dispute concerning the material facts because the factual

8   allegations of Plaintiffs' Complaint are taken as true. *Marcelos v. Dominguez*,

9   2009 WL 230033, at *4 (N.D. Cal. Jan. 29, 2009). In any event, the facts alleged

10  in the Complaint are straightforward, and are not subject to reasonable dispute.

11  *See JBR, Inc. v. Cafe Don Paco, Inc.*, 2014 WL 5034640, at *14 (N.D. Cal. Aug.

12  25, 2014) ("Because the defendants have not made an effort to challenge the

13  complaint, there is nothing to suggest that a dispute in the facts exists.")

14      **E.    Possibility of Excusable Neglect**

15          Under the sixth *Eitel* factor, the Court considers whether Thorpe's default

16  resulted from excusable neglect. *Eitel*, 782 F.2d at 1471-72. That is unequivocally

17  not the case here. As discussed above, Thorpe has been properly served with

18  summons and service of entry of default. ECF 37, 57. "Generally, courts will not

19  find a defendant's failure to participate excusable where the defendant has been

20  properly served and has notice of the entry of default and the motion for default

21  judgment." *JBR, Inc.*, 2014 WL 5034640, at *14. The failure to appear is

22  particularly inexcusable here. Thorpe acknowledged, through his delivery

23  signature, that he received the summons. ECF 37. Defendant Thorpe's failure to

24  respond was a deliberate choice born out of a desire to avoid discovery.

25      **F.    Policy for Deciding Case on the Merits**

26          The final *Eitel* factor considers the preference for deciding cases on the

27  merits. *Eitel*, 782 F.2d at 1471-72. "However, this factor, standing alone, cannot

28  suffice to prevent entry of default judgment for otherwise default judgment could

Mitchell
Silberberg &
Knupp LLP

14994646.3

1   never be entered." *Caridi*, 346 F. Supp. 2d at 1073.  Indeed, Rule 55 specifically

2   authorizes the termination of a case before a hearing on the merits in these precise

3   circumstances.  *See Bryant*, 2004 WL 783123, at *5; *Elektra Entm't Grp.*, 226

4   F.R.D. at 393.  As a result, "the preference to decide cases on the merits does not

5   preclude a court from granting default judgment." *PepsiCo, Inc.*, 238 F. Supp. 2d

6   at 1177.  The only reason this lawsuit cannot proceed to the merits is because

7   Thorpe has failed to appear.

8   **V.     PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION**

9   **        AND MONETARY DAMAGES IN THE AMOUNT OF $2,364,265.42.**

10  **       A.     Plaintiffs are Entitled to a Permanent Injunction.**

11          To obtain permanent injunctive relief, a plaintiff must show "(1) that it has

12  suffered an irreparable injury; (2) that remedies available at law, such as monetary

13  damages, are inadequate to compensate for that injury; (3) that, considering the

14  balance of hardships between the plaintiff and defendant, a remedy in equity is

15  warranted; and (4) that the public interest would not be disserved by a permanent

16  injunction." *Kerbel*, 2012 WL 3166798, at *15.

17          Irreparable injury plainly is present here.  The Cheating Software has

18  harmed Plaintiffs' reputation and goodwill with its business partners and players.

19  *See, e.g., Gucci Am., Inc. v. Huoqing*, 2011 WL 31191, at *12-15 (N.D. Cal. Jan. 3,

20  2011) (irreparable injury would be suffered to reputation and goodwill if injunctive

21  relief not granted against online infringer and counterfeiter).  Monetary damages

22  cannot compensate for this irreparable harm, and the only appropriate remedy is to

23  enjoin the further distribution and sale of the Cheating Software.  The balance of

24  hardships also clearly falls in Plaintiffs' favor.  Thorpe's conduct was and is

25  unlawful.  Plaintiffs have been irreparably harmed by that conduct, and that harm

26  continues to compound so long as the Cheating Software is available on the

27  internet.  *Id.*  Given the nature of the harm to Plaintiffs, Thorpe has no equity on

28  his side and the public interest – in enforcing the DMCA and imposing

Mitchell
Silberberg &
Knupp LLP

14994646.3

21          CASE NO. 3:21-cv-05677
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

1    consequences upon those who distribute unlawful cheating and circumvention

2    software – is unmistakably on the side of Plaintiffs.[7]

3          The injunctive relief Plaintiffs request is narrowly tailored to only bar

4    Defendants from engaging in the very activities that led to this litigation.  *Chanel,*

5    *Inc. v. Lin*, 2010 WL 2557503, at \*12 (N.D. Cal. May 7, 2010) ("[A]n injunction

6    must be narrowly tailored to remedy only the specific harms shown by Plaintiffs

7    rather than to enjoin all possible breaches of the law.").  Accordingly, Plaintiffs are

8    entitled to entry of the Proposed Injunction submitted herewith.  *See, e.g.,*

9    *Facebook, Inc. v. Grunin*, 77 F. Supp. 3d 965, 973 (N.D. Cal. 2015).

10         **B.     Plaintiffs are Entitled to Damages In The Amount Of $2,237,760.**

11         Plaintiffs seek an award of statutory damages under both Section 1201 of the

12   DMCA and Section 504 of the Copyright Act.  Courts routinely award statutory

13   damages as part of default judgments in cases involving violations of the DMCA

14   and copyright infringement.  *See, e.g., Reeves*, 2010 WL 4054095, at \*2-3;

15   *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1063-64 (N.D. Cal.

16   2010).  Statutory damages are especially appropriate in circumstances where actual

17   damages are inadequate or difficult to prove.  *See Nintendo of Am., Inc. v. Dragon*

18   *Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994).  The need to rely upon statutory

19   damages as an approximation of actual damages is especially appropriate where, as

20   here, the goal is to assess the damage caused by bad actors whom, by design,

21   operate in the shadows and then refuse to participate in any discovery.  *See, e.g.,*

22   *Blizzard Ent., Inc. v. Bossland GmbH*, No. CV 16-1236, 2017 WL 7806600, at \*9

23   (C.D. Cal. Mar. 31, 2017) (awarding $8,563,600.00 in statutory damages under the

24   DMCA).  That is exactly the case here.

25

26   [7] In addition to the harms identified above, Ring-1 is a malicious software product
27   that exploits vulnerabilities in a user's computer in a similar manner to malware
     and ransomware.  These vulnerabilities could be used to access private information
28   from a user's computer or hijack the computer for unlawful purposes. Kaiser Decl.
     ¶ 10.

Mitchell
Silberberg &
Knupp LLP

14994646.3

1   **Section 1201 of the DMCA.**  Under the DMCA, a plaintiff is entitled to

2   statutory damages of "not less than $200 or more than $2,500 per act of

3   circumvention, device, product, component, offer, or performance of service, as

4   the court considers just."  17 U.S.C. § 1203(c)(3)(A) (emphasis added).  Courts in

5   the Ninth Circuit have held that awards for statutory damages for violations of the

6   DMCA, including trafficking in circumvention devices, may be based on the

7   number of end-user distributions of each device or product.  *See Sony Computer*

8   *Entm't Am., Inc. v. Divineo*, Inc., 457 F. Supp. 2d 957, 966-67 (N.D. Cal. 2006)

9   (same); *Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1074

10  (N.D. Cal. 2005) (same).  In other words, Plaintiffs are entitled to a separate award

11  for each download by each end-user of the Cheating Software in the United States.

12  *Dish Network, L.L.C. v. SatFTA*, 2011 WL 856268, at *7-8 (N.D. Cal. Mar. 9,

13  2011) (awarding damages "on a per-download basis"); *Reeves*, 2010 WL 4054095,

14  at *2-3 (damages based on number of people who obtained circumvention device).

15  By this motion, Plaintiffs seek statutory damages in an amount equal to the

16  cost of a one-year subscription for each U.S. user of the Cheating Software.  On

17  the Ring-1 Website, R6S cheats are advertised at $50/month (or $600/year) and D2

18  cheats are advertised at $120/month (or $1,440/year).  Because Defendants

19  designed the Cheating Software to be "undetected," it is impossible for Plaintiffs to

20  determine the precise number of times that the Cheating Software was distributed

21  to users in the United States.  However, Plaintiffs have been able to determine that

22  at least 1,823 R6S players and 2,295 Destiny 2 players have been ***caught and***

23  ***banned*** for using the Cheating Software.  Ubisoft conservatively estimates that the

24  number of ***U.S.*** players who used the Ring-1 cheat for R6S is 592.  Muraccini

25  Decl. ¶ 8.  Thus, the damages to Ubisoft are at least $355,200 ($600 per year, per

26  user, multiplied by 592 users).  Additionally, Bungie conservatively estimates that

27  the number of ***U.S.*** players who used the Ring-1 cheat for Destiny 2 is 1,099, so

28  the damages to Bungie are 1,582,560 ($1,440 per year, per user, multiplied by

Mitchell
Silberberg &
Knupp LLP

14994646.3

23          CASE NO. 3:21-cv-05677
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

1,099 users).  Kaiser Decl. ¶ 8.

The above statutory damages analysis totaling $1,937,760 is very conservative.  It almost certainly underestimates the actual number of users for several reasons.  **First**, Ring-1 claims that the Cheating Software is "safe" and that most users of the Cheating Software have not been banned.  Thus, Plaintiffs are only accounting for the users of their Games that were actually caught.  It is likely that many more cheaters have not yet been caught.  **Second**, the damage analysis is conservative because Plaintiffs are only calculating verified U.S. IP addresses. U.S. players using the Cheating Software may use spoofed or proxy IP addresses. **Third**, Plaintiffs are only accounting for one year's worth of a Ring-1 subscription. It is possible, and indeed likely, that many of these users have been using the Cheating Software for more than one year.  Thus, Plaintiffs believe that their calculation is fair and reasonable.  *See Reeves*, 2010 WL 4054095, at *2-3 (discussing substitutes to calculating damages when the number of violations is difficult to determine); *Bossland*, 2017 WL 7806600, at *9 (awarding damages on a per-download basis).  Indeed, it is far less than other courts have awarded in similar circumstances.  *See, e.g., Reeves* (awarding $3,052,339 in disgorged profits, $85,478,600 in statutory damages, and $63,600 in attorneys' fees).

**Section 504 of the Copyright Act.**  Section 504(c) of the Copyright Act entitles a copyright owner to statutory damages of "not less than $750 or more than $30,000 as the court considers just" for each work infringed.  This amount may be increased to $150,000 where the infringement was committed "willfully." Maximum statutory damages may be awarded on motions for default judgment. *See, e.g.*, *Perfect 10, Inc. v. Talisman Comm'ns Inc.*, No. CV99-10450 RAP, 2000 WL 364813, at *4 (C.D. Cal. March 27, 2000); *Warner Bros. Entm't Inc. v. Caridi*, 346 F. Supp. 2d 1068, 1072 (C.D. Cal. 2004).  Plaintiffs have adequately alleged that Thorpe's infringement was willful and deliberate.  *See* Section III.A, *supra*. Thus, for the two copyrights principally at issue in this lawsuit, Plaintiffs seek

Mitchell
Silberberg &
Knupp LLP

14994646.3

24                    CASE NO. 3:21-cv-05677
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

1   $300,000 in statutory damages.  Together with the statutory damages for section

2   1201 of the DMCA, this amounts to $2,237,760.[8]

3         **C.    Plaintiffs are Entitled to Reasonable Attorneys' Fees and Costs.**

4         Both the Copyright Act and the DMCA entitle Plaintiffs to an award of

5   attorneys' fees and costs.  17 U.S.C. § 1203(b)(4), (5).  Plaintiffs are entitled to an

6   award of attorneys' fees in the amount of no less than $126,505.42, which

7   represents just one-half of the fees and costs incurred from the inception of the

8   case through October 2022.

9   **VI.   CONCLUSION**

10        Plaintiffs respectfully request that the Court enter a default judgment in

11  favor of Plaintiffs and against Defendant Thorpe, for a monetary award of

12  $2,237,760, an injunction in the form of the concurrently-filed Proposed

13  Injunction, and costs and fees in the amount of $126,505.42.

14

15  DATED: December 13, 2022          MITCHELL SILBERBERG & KNUPP LLP

16

17                                    By:  /s/ Marc E. Mayer
18                                         Marc E. Mayer
                                           Attorneys for Plaintiffs
19

20

21

22

23

24  ───────────────────
[8] Split by Plaintiff, the $2,237,760 in monetary damages calculation is as follows:
25  for Bungie: $1,732,560 (consisting of $1,582,560 (§1201 damages) and $150,000
    (§504 damages)); for Ubisoft: $505,200 (consisting of $355,200 (§1201 damages)
26  and $150,000 (§504 damages)). Moreover, Plaintiffs have not calculated the
    amount spent in combatting cheats (including the cost of programming upgrades to
27  the detection mechanisms), the number of players who stopped playing the Games
    because of cheaters, and the impact of cheating on the Games' overall reputation
28  and marketplace appeal.  However, these damages are significant and almost
    certainly far exceed the amount sought here.

Mitchell
Silberberg &
Knupp LLP

14994646.3

## CERTIFICATE OF SERVICE CM/ECF

I hereby certify under penalty of perjury that on December 13, 2022, I electronically filed the foregoing document entitled **NOTICE OF MOTION AND MOTION OF PLAINTIFFS FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANT ANDREW THORPE**, with the Clerk of Central District of California by using the Court's CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the Central District of California's CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users and I have mailed the foregoing document by First Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Andrew L. Thorpe a/k/a Krypto
Flat 2
4 Clarence Road
Bridlington
YO15
**Defendant**

/s/ Marc E. Meyer
Attorney for Plaintiffs
E-mail: mem@msk.com

Mitchell
Silberberg &
Knupp LLP

14994646.3

26                    CASE NO. 3:21-cv-05677
**MOTION FOR ENTRY OF DEFAULT JUDGMENT**