UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUNGIE, INC., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>ANDREW THORPE, et al.,<br><br>    Defendants. | Case No. 21-cv-05677-EMC<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**<br><br>Docket No. 64 |

Plaintiffs are companies that own and publish video games. At issue are two of the companies' online multiplayer video games: (1) "Destiny 2," which is owned and published by Bungie, Inc. and (2) "Tom Clancy's Rainbox Six: Siege," which is owned and published by Ubisoft Entertainment and Ubisoft, Inc. Plaintiffs filed suit against four individuals, including Andrew Thorpe, alleging that these individuals participated in an online business venture known as "Ring-1," which sells software that enables players to cheat in Plaintiffs' games.

Pending before the Court is Plaintiffs' motion for default judgment against Mr. Thorpe, a resident of the United Kingdom. Having considered the papers submitted as well as the oral argument of counsel, the Court hereby **DENIES** the motion.

    **I.    FACTUAL & PROCEDURAL BACKGROUND**

Plaintiffs' complaint and evidence in support of their motion for default judgment reflect as follows.

Bungie and Ubisoft own and publish video games. Specifically:

- Bungie owns and publishes the video game "Destiny 2." Compl. ¶ 1. Destiny 2 is an open, "shared-world" multiplayer, "first-person shooter" game where players

either cooperate to fight against computer-controlled opponents or compete against other players. *Id*. ¶ 23.

- Ubisoft owns and publishes the video game "Tom Clancy's Rainbow Six: Siege" ("R6S"). *Id.* ¶ 1. R6S is a team-based, online multiplayer, military-themed, "first-person shooter" game where players cooperate with their team members, against a competing team of players. *Id.* ¶ 27.

Collectively, Destiny 2 and R6S are referred to as the "Games." The intensity of competition in the Games gives rise to a demand for cheating software that gives players an unfair advantage. *Id*. ¶¶ 24, 28.

To protect the Games from cheating, Plaintiffs employ anti-cheat technologies installed on players' computers when the Games software is installed. *Id*. ¶ 52. The anti-cheat software functions to detect whether malicious code has been inserted into a computer's memory, or whether a player is using cheating software. *Id*. ¶ 53. Once cheating software is detected, Plaintiffs will deny the player access to the remote multiplayer server. *Id*. In some circumstances, Plaintiffs may also permanently delete the player's accounts, or ban the player's computer from subsequent access to the Games through a new account or email address. *Id*. ¶¶ 53, 55.

Ring-1 is an enterprise[1] that develops, markets, and sells on its website certain software ("Cheating Software") that circumvents Plaintiffs' anti-cheat technologies and enables players to cheat in the Games. *Id*. ¶¶ 2, 64, 81. Ring-1 advertises its Cheating Software as "100% guaranteed to always play with an undetected cheat." *Id.* ¶ 81. The Cheating Software has numerous features that help avoid detection, including technologies that purport to bypass bans and disguise cheating activities. *Id*. ¶ 82. Even when the Cheating Software is detected by Plaintiffs, Ring-1 will promptly update and test its Cheating Software until it is undetectable again. *Id*. ¶ 84.

Apparently, Ring-1 markets and sells Cheating Software through its website, as well as a network of authorized resellers, including resellers in the United States. Mayer Decl. ¶¶ 2, 17; *see*

---

[1] Ring-1 does not appear to be a formal legal entity such as a corporation or partnership. Mot. at 5.

*also* Compl. ¶¶ 14-16 (alleging that three of the four individual defendants, *i.e.*, Jonathan Agueda, Ahmad Mohammed, and Wesam Mohammed are resellers, all based in the United States).  The Ring-1 website and all message boards are in English, and prices are currently listed in U.S. dollars.  *Id.* ¶ 6.  Thus far, Bungie has banned about 2,295 accounts for using the Cheating Software.  About 1,099 of those accounts were from an IP address that originates in the United States.  Kaiser Decl. ¶¶ 7-8.  As for Ubisoft, it has banned about 1,823 players for using the Cheating Software, and, of those accounts, about 592 players appear to be located in the United States based on the IP address.  Muraccini Decl. ¶¶ 7-8.

As indicated above, Plaintiffs filed suit against four individuals affiliated with the Ring-1 enterprise: Mr. Agueda, the two Mohammeds, and Mr. Thorpe.  All are based in the United States, except for Mr. Thorpe who is a resident of the United Kingdom.

None of the four individuals sued is claimed to be the owner of the Ring-1 website.  Mayer Decl., Ex. 12 (Mr. Agueda stating in an unidentified message board that "[t]he devs [*i.e.*, developers] own the website").  According to Plaintiffs, both Mr. Agueda and the two Mohammeds are resellers of the Cheating Software.  Compl. ¶¶ 14-16.  Mr. Agueda also "run[s]" the Ring-1 website, along with Mr. Thorpe.  Mayer Decl., Ex. 12.  Plaintiffs have characterized Mr. Thorpe as a prominent member of the Ring-1 enterprise based on his role in "running" the website.  Supp. Br. at 2-3 (asserting that Mr. Thorpe is a "lead," "high-level," and "prominent" administrator of the website).  However, the evidence submitted by Plaintiffs in support of their motion for default judgment suggests otherwise.[2]  Mr. Thorpe is not an original developer of the software or an original participant in the Ring-1 enterprise, but only joined after Ring-1 had already attracted many users.  Mayer Decl., Ex. 13(a) ("@Krypto Is now a new support to the team ! He showed alot of potential and helped alot of users even without the role ! Welcome mate ^^").[3]  His role at the Ring-1 enterprise appears to be  akin to a customer service representative.

---

[2] Plaintiffs have also claimed that Mr. Thorpe received revenue in connection with the sale of the Cheating Software, Supp. Br. at 3, and managed a network of resellers, Mot. at 5-6, but there is no evidence to support these claims.

[3] For purposes of the pending motion, the Court accepts Plaintiffs' assertion that "Krypto" and "Cypher" are aliases for Mr. Thorpe.  Plaintiffs claim that they have evidence to link Mr. Thorpe

3

1  For example, customers have asked him for information related to the Cheating Software such as its features, operations, and updates. Mayer Decl., Ex. 13(c)-(d). Also, Mr. Thorpe has given advice to customers about where and how the Cheating Software can be purchased, and confirmed that purchases have gone through. Mayer Decl., Ex. 13(f)-(h).

Plaintiffs initiated this lawsuit against the four individuals, asserting the following claims for relief: (1) trafficking in circumvention devices (a violation of the Digital Millennium Copyright Act ("DMCA"), (2) copyright infringement, (3) trademark infringement, (4) false designation of origin, (5) intentional interference with contractual relations, (6) unfair competition, and (7) violation of Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq. Compl. ¶¶ 91–146. Mr. Agueda and the two Mohammeds eventually made appearances and reached settlements with Plaintiffs. The settlement agreements provided for injunctions, as well as monetary relief ($600,000 total). Docket Nos. 62, 70.

Mr. Thorpe has not made an appearance in this suit, even though the Court has already determined that service was properly made on him. Docket Nos. 33, 35, 41 (orders initially denying entry of default against Mr. Thorpe based on improper service but eventually granting entry of default based on proper service). Mr. Thorpe's default was entered in April 2022. Docket No. 42 (notice of entry of default).

Following entry of default, Plaintiffs filed the currently pending motion for default judgment. In the motion, Plaintiffs argued that this Court has personal jurisdiction over Mr. Thorpe, even though he is a resident of the United Kingdom, and that the Court should find Mr. Thorpe liable for three out of the seven claims asserted in the complaint – specifically, (1) trafficking in circumvention devices (a violation of the DMCA), (2) copyright infringement, and (3) intentional interference with contractual relations. In terms of relief, Plaintiffs asked for a permanent injunction, over $2.3 million in statutory damages (under both Section 1201 of the DMCA and Section 504 of the Copyright Act), and attorneys' fees and costs in the amount of $126,505.42. Prior to the hearing on the motion for default judgment, the Court asked Plaintiffs to

---

to these identities but have not provided such evidence to the Court to review.

4

provide additional information about Mr. Thorpe and his role in Ring-1.

## II.  DISCUSSION

A.  Legal Standard

Under Federal Rule of Civil Procedure 55(b)(2), a court may enter a default judgment when the clerk has already entered a party's default. Fed. R. Civ. P. 55(a)-(b). "The district court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Upon default, "all well-pleaded allegations regarding liability are taken as true, except with respect to damages." *DiscoverOrg Data, LLC v. Bitnine Glob., Inc.*, No. 19-CV-08098-LHK, 2020 WL 6562333, at *2 (N.D. Cal. Nov. 9, 2020). However, a court still may conduct hearings or make referrals where needed to "establish the truth of any allegation by evidence, or investigate any other matter." Fed. R. Civ. P. 55(b)(2).

A court may dismiss a motion for default judgment for lack of personal jurisdiction because "[a] judgment entered without personal jurisdiction over the parties is void." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). Where proof is limited to written materials rather than an evidentiary hearing, a plaintiff's burden is to make a prima facie showing of personal jurisdiction. *APL Co. Pte v. TDR Logistics Inc.*, No. 2:20-CV-05999-SB-PD, 2022 WL 16859648, at *1 (C.D. Cal. Apr. 7, 2022); *see also Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990).

B.  Personal Jurisdiction

In the instant case, the critical issue is whether this Court has personal jurisdiction over Mr. Thorpe, who is a resident of the United Kingdom.

Federal Rule of Civil Procedure 4(k)(2) provides that, "[f]or a claim that arises under federal law, serving a summons . . . establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2).

> Rule 4(k)(2) was established in "respon[se] to the Supreme Court's suggestion that the rules be extended to cover persons who do not reside in the United States, and have ample contacts with the nation as a whole, but whose contacts are so scattered among states that none of them would have jurisdiction."

> . . . . Under Rule 4(k)(2), the plaintiff must prove: (1) the claim at issue arises from federal law; (2) the defendants are not subject to any state's courts of general jurisdiction; and (3) invoking jurisdiction upholds due process (namely, that jurisdiction is not unreasonable).

*Lang Van, Inc. v. VNG Corp.*, 40 F.4th 1034, 1040 (9th Cir. 2022).

In the instant case, factor (1) is satisfied. Federal law is implicated as Plaintiffs have brought claims for violation of the DMCA and the Copyright Act. Factor (2) is sufficiently met as well. Although it is unclear whether Mr. Thorpe might be subject to the general jurisdiction of another state's court, his refusal to participate in this litigation has denied Plaintiffs the opportunity to discover such information. Furthermore, "this Court need not 'traipse through the 50 states, asking whether each could entertain the suit.'" *Talavera Hair Prod., Inc. v. Taizhou Yunsung Elec. Appliance Co.*, No. 18-CV-823 JLS (JLB), 2021 WL 3493094, at *9 (S.D. Cal. Aug. 6, 2021) (quoting *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007)). Thus," 'absent any statement from [Mr. Thorpe] that [he] is subject to the courts of general jurisdiction in another state, the second requirement of Rule 4(k)(2) is met.'" *Id*. (quoting *Holland*, 485 F.3d at 462).

This leaves factor (3) which, as noted above, asks whether it would comport with due process for Mr. Thorpe to be subject to a court in the United States. "The due process analysis under Rule 4(k)(2) is nearly identical to traditional personal jurisdiction analysis with one significant difference: rather than considering contacts between [the defendant] and the forum state, we consider contacts with the nation as a whole." *Holland*, 485 F.3d at 462 (also noting that, in the "few cases in which our sister circuits have concluded that Rule 4(k)(2) conferred jurisdiction," the defendants have had "extensive contacts with this country.").

Here, Plaintiffs claim that there is, in effect, specific jurisdiction over Mr. Thorpe based on his contacts with the United States.

Under Ninth Circuit law, there is a three-prong test for evaluating specific jurisdiction: "(1) the defendant must either purposefully direct his activities toward the forum or purposefully avail[ ] himself of the privileges of conducting activities in the forum; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of

6

jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable." *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1208 (9th Cir. 2020). The first prong is determinative in this case.

For the first prong, Plaintiffs have asserted tort-based claims against Mr. Thorpe, and thus the question is whether Mr. Thorpe purposefully directed his activities toward the United States. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) ("In tort cases, we typically inquire whether a defendant 'purposefully direct[s] his activities' at the forum state . . . ."); *see AMA Multimedia*, 970 F.3d at 1208 (noting that copyright infringement sounds in tort). A defendant purposefully directs his activities at the forum where he has "(1) committed an intentional act; (2) expressly aimed at the forum state; (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* For purposes of the pending motion, the Court need only address the "express aiming" factor.

According to Plaintiffs, Thorpe did expressly aim acts at the United States, but Plaintiffs' position is predicated on the contacts of the Ring-1 enterprise *generally,* and not on Mr. Thorpe's own contacts *specifically*. The problem for Plaintiffs is that they have failed to show that it is proper to attribute the contacts of the broader enterprise to Mr. Thorpe.

For instance, there is no indication that the Ring-1 enterprise and Mr. Thorpe should be considered alter egos. *Cf. Phornphan Chubchai v. Abbvie, Inc.*, 599 F. Supp. 3d 866 (N.D. Cal. 2022) (indicating that, for purposes of personal jurisdiction, an alter ego relationship between a parent and subsidiary allows for one entity's contacts to be fairly attributable to the other). Plaintiffs have made no showing "(1) that there is such unity of interest and ownership that the separate personalities of [Ring-1 and M. Thorpe] no longer exists and (2) that failure to disregard their separate identities would result in fraud or injustice." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1021 (9th Cir. 2017). Rather, as noted above, Mr. Thorpe seems to be little more than a customer service representative for Ring-1, and he apparently was not an original developer or original participant of Ring-1. Mayer Decl., Ex. 13(a).

Even if Ring-1's contracts and activities could be imputed to Mr. Thorpe on a lesser showing than alter ego, *e.g.*, if he were the equivalent of a general partner, there is no such

7

evidence. *See* Mayer Decl., Ex. 12; Mayer Decl., Ex. 13(a)-(l). Although Mr. Agueda, a co-Defendant who settled with Plaintiffs, once stated in a forum that he and Mr. Thorpe ran the Ring-1 website, but the term "run" is vague. The actual evidence presented, as noted above, suggests Mr. Thorpe "ran" the enterprise as a kind of customer representative, not as a principal with an ownership interest in Ring-1.

Finally, although an argument could be made that Mr. Thorpe and the other participants in the Ring-1 enterprise are co-conspirators, the Ninth Circuit has yet to endorse a theory under which one conspirator's contacts could be attributed to another for purposes of personal jurisdiction. *See Hong Kong uCloudlink Network Tech. Ltd. v. SIMO Holdings Inc.*, No. 18-CV-05031-EMC, 2019 WL 331161, at *6 (N.D. Cal. Jan. 25, 2019) (noting that "[t]he Ninth Circuit has not yet ruled on the validity of this theory," but has "rejected an analogous theory for venue purposes"); *see also Ansah v. Regime PPR*, No. CV 21-8829-DMG (JPRx), 2022 U.S. Dist. LEXIS 33982, at *8 (C.D. Cal. Feb. 10, 2022) (noting the same).

Accordingly, the Court rejects Plaintiffs' contention that it may consider all of Ring-1's contacts generally in establishing personal jurisdiction over Mr. Thorpe. The Court instead evaluates whether due process allows for Mr. Thorpe to be subject to this Court's jurisdiction based on *his* contacts with the United States alone. *See Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("[T]he relationship [among the defendant, the forum, and the litigation] must arise out of contacts that the 'defendant *himself*' creates with the forum State."). The evidence of record on Mr. Thorpe's contacts with the United States is little to none.

First, contrary to what Plaintiffs argue, the fact that the two Plaintiffs are located in the United States does not mean that Mr. Thorpe has thereby targeted the United States. In *Walden*, the Supreme Court expressly took note that a "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id*. at 285 (also noting that "the plaintiff cannot be the only link between the defendant and the forum").

Second, although Mr. Thorpe may have assisted customers, there is no evidence that any of those customers were based in the United States. For example, the screenshots of Mr. Thorpe's

1    customer-support chats shed no light on whether any of these customers were located in the
2    United States. Mayer Decl., Ex. 13(a)-(l). To the extent that Plaintiffs have submitted some
3    online reviews of Ring-1 that come from U.S. customers, Mayer Decl., Ex. 14, there are only
4    seven such reviews. Even assuming that all of those customers interacted with Mr. Thorpe (there
5    is no evidence of such happened to be U.S. based), there was such a small number that it would
6    not be enough for Mr. Thorpe to reasonably expect to be haled into the United States. In other
7    words, these contacts would be too random, fortuitous, or attenuated to satisfy the minimum
8    contacts requirement. *See Walden*, 571 U.S. at 286 (stating that a defendant cannot be haled into
9    court "based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other
10   persons affiliated with the State"); *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068
11   (9th Cir. 2017) (stating that "any California contacts Acerchem UK [defendant] created by sending
12   a single newsletter to 55 recipients of unknown residence are too 'attenuated'"). *Compare Keeton*
13   *v. Hustler Mag., Inc.*, 465 U.S. 770, 772 (1984) (finding sufficient contacts where an out-of-state
14   defendant sold some 10 to 15,000 copies of magazine in the forum state each month).
15        More fundamentally, there is nothing to indicate that Mr. Thorpe reached out and solicited
16   these customers. Rather, the evidence indicates that the customers reached out to him. *See Future*
17   *Motion, Inc. v. Batteries LLC*, No. 21-cv-06771-EMC, 2022 U.S. Dist. LEXIS 79206, at *13-14
18   (N.D. Cal. May 2, 2022) ("[Plaintiff] Future Motion has provided evidence demonstrating that
19   [defendant] JW has communicated with both prospective and existing customers located in
20   California. But nothing in these communications suggests that JW is soliciting the customers;
21   rather, the communications indicate that it is customers who are unilaterally reaching out to JW.
22   Moreover, there is no evidence that JW's communications with customers targeted California in
23   any way."); *see also Will Co. v. Lee*, 47 F.4th 917, 922 (9th Cir. 2022) (noting that a defendant
24   must have "actively 'appealed to' and 'profited from' an audience in that forum").
25        Finally, Plaintiffs have pointed out that a number of U.S.-based Game users were banned
26   for using Cheating Software. But without information about the number of Ring-1's U.S.
27   customers relative to other countries, this evidence does not shed light on whether Ring-1 has a
28   disproportionate or sizeable customer base in or revenue from the United States which might

1  suggest a marketing focus on the United States; nor does it demonstrate Mr. Thorpe focused his
2  assistance on United States customers in particular.[4]  *Cf. Good Job Games Bilism Yazilim Ve*
3  *Pazarlama A.S. v. SayGames LLC*, No. 19-cv-07916-EMC (N.D. Cal. Dec. 07, 2022); *Will Co. v.*
4  *Lee*, 47 F.4th 917, 923 (9th Cir. 2022) ("[B]ecause '[a] substantial number of hits to Brand's
5  website came from California residents,' California consumers had generated a substantial profit
6  for the firm.").  Even assuming a notable U.S. customer base, "[Ring-1's] forum-based traffic,
7  absent *other* indicia of [Mr. Thorpe's] personal direction, does not establish that [Mr. Thorpe]
8  tailored the website to attract U.S. traffic." *AMA Multimedia*, 970 F.3d at 1211 (emphasis added)
9  (finding that a website with 20% traffic from the forum *alone* is not enough to prove the website
10 operator's purposeful direction at the United States).  In fact, there is no indication that Mr.
11 Thorpe engaged in any kind of marketing other than customer support and announcing software
12 updates.
13    In sum, Plaintiffs have failed to establish that Mr. Thorpe purposefully directed his
14 activities at the United States sufficient to confer personal jurisdiction.  Without the requisite
15 minimum contacts, the Court does not have specific personal jurisdiction over Thorpe pursuant to
16 Rule 4(k)(2), and thus a default judgment is not warranted.
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///

---

[4] During the hearing, the Court asked Plaintiffs to disclose its detection mechanism in order to determine whether this number is a fair sample of Ring 1's U.S. customer base.  Plaintiffs declined to disclose.

### III. CONCLUSION

For the foregoing reasons, the Court **DENIES** the motion for default judgment. Because the Court is denying the motion for default judgment as to Mr. Thorpe, and Plaintiffs have settled with the three other defendants in the case, the Court sees no reason not to enter a final judgment.

This order disposes of Docket No. 64. Accordingly, the Court directs the Clerk of the Court to enter a final judgment in accordance with this opinion and close the file in this case.[5]

**IT IS SO ORDERED**.

Dated: February 21, 2023

_____
EDWARD M. CHEN
United States District Judge

---

[5] Although the Court is denying Plaintiffs' motion for default judgment, it notes that Mr. Thorpe should still be subject to the injunctions entered against the three other defendants, that is, so long as he has notice of the injunctions. *See* Docket No. 62 (in ¶ 2 of the stipulated judgment against the Mohammeds, providing for injunctive relief against "Defendants, all persons acting under Defendants' direction or control . . . , and those persons or companies in active concert or participation with Defendants who receive actual notice of this Order"); Docket No. 70 (providing for the same in ¶ 2 of the stipulated judgment against Mr. Agueda); *see also* Fed. R. Civ. P. 65(d)(2)(A) (addressing who is bound by an injunction – which includes "persons who are in active concert or participation with" a party or a party's agents or employees, so long as they "receive actual notice of it by personal service or otherwise"). However, absent personal jurisdiction, this Court has no power to enforce the injunction against Mr. Thorpe. *See Hilao v. Estate of Marcos (In re Estate of Marcos Human Rights Litig.)*, 94 F.3d 539, 545 (9th Cir. 1996) ("While Rule 65(d) indeed automatically makes the injunction against the Estate binding upon persons 'in active concert or participation with' the Estate who have actual notice of the injunction, the district court went further by specifically finding that the Republic is such a person and thus expressly binding it by the injunction. However, in order to enforce this injunction against the Republic, through, for example, contempt proceedings, the district court would have to have personal jurisdiction over the Republic . . . An injunction against the Republic in the absence of personal jurisdiction over it would be futile, as the court would be powerless to enforce its injunction.").

11